I4NQGRAc1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
UNITED STATES OF AMERICA

      v.                    16 CR 568 (GHW)

JAMES GRANT, MICHAEL
HARRINGTON and JEREMY
REICHBERG

                                Final Pretrial
                                Conference

            Defendants
------------------------------x

                                New York, N.Y.
                                April 23, 2018
                                10:10 a.m.

Before:

                    HON. GREGORY H. WOODS
                                District Judge

                       APPEARANCES

GEOFFREY S. BERMAN
    Interim United States Attorney for the
    Southern District of New York
MARTIN BELL
KIMBERLY RAVENER
JESSICA LONGERGAN
    Assistant United States Attorney

MERINGOLO & ASSOCIATES, PC
    Attorneys for Defendant Grant
JOHN C. MERINGOLO
ANJELICA B. CAPPELLINO

HAFETZ NECHELES LLP
    Attorneys for Defendant Reichberg
SUSAN NECHELES
KATHRYN CASSIDY

(Case called)

MR. BELL:  Good morning, your Honor.

Martin Bell, Kim Ravener and Jessica Lonergan for the government.

THE COURT:  Thank you.  Good morning.

MS. NECHELES:  Good morning, your Honor.

Susan Necheles and Kate Cassidy difficult for Mr. Reichberg who is here today in court.

THE COURT:  Thank you.  Good morning.

MS. CAPPELLINO:  Anjelica Cappellino and John Meringolo for James Grant.

THE COURT:  Good.  Thank you very much.  Good morning.

We are here for a conference with respect to our upcoming trial in this case.  There are a number of issues that we should discuss.  I am sorry that we are not able to proceed on Friday.  I was charging the jury, and it wasn't clear to me that we would be able to begin on time or even close to on time.

With respect to that, I will note that my jury is still out, so if there is a note, I will expect that we will have to take a pause in the proceedings in this case in order to take up the note.

There are a number of issues that we do need to address.  I have seen the letters submitted by the defendant Reichberg last night.  I reviewed it briefly.  I'm happy to

talk about a number of the issues that are raised in it.  Some of them have been raised to the Court for essentially the first time, and the government has not had a chance to respond.

So I think what I would like to propose to do is to begin with what is effectively the proposed agenda suggested by counsel for Mr. Reichberg.  We can start with that, and then we can proceed with respect to the other issues that are raised in the letter.

Is there anything else that we should prepare to discuss in addition to those issues before we begin?

Counsel for the United States?

MS. RAVENER:  Yes, your Honor.  The government has also made a motion for a clarification and amendment of the 3500 protective order.

THE COURT:  Thank you.  I saw that letter as well.  Good.

Anything else that we should discuss during today's proceeding?  Counsel for defendants?

MS. NECHELES:  No, your Honor.

THE COURT:  Thank you.

So let's take this up in the order that the issues were presented in Ms. Necheles' and Ms. Cassidy's letter from last night.  I propose to discuss much the same set of issues, but I did not share my agenda with you beforehand, so I am happy to follow the one proposed by the parties.

I would like to begin, however, before talking about each of the new sets of the issues that have been briefed following our April 6 conference, I want to talk briefly about one motion that was not brought; namely, a motion to sever Mr. Grant's trial from that of Mr. Reichberg following the interposition of the superseding indictment.

Based on comments by defense counsel both from Ms. Necheles and counsel for Mr. Grant, I had anticipated that such a motion would be brought and set a schedule for the briefing of that motion.

Counsel for Mr. Grant, I take it that you decided that it was not in the defendant's best interest to submit such a motion.  Is that accurate?

MS. CAPPELLINO:  Yes, your Honor.  Thank you for the briefing schedule, but we have decided not to submit that motion.

THE COURT:  Good.  Thank you.  So Mr. Grant is aware of the expanded nature of the allegations in the superseding indictment and the prospect of enhanced spillover prejudice to him as a result of those modifications to the superseding indictment.  We discussed that at our prior conference, and I commented on the issue.  He has decided not to request severance.  That is a completely understandable strategic or tactical decision for him to make.  I understand that defendant Grant must believe that there is some benefit from a joint

trial, which, in Mr. Grant's calculation, outweighs any value of making an application to sever on the basis of any spillover prejudice despite the enhanced risk of that as a result of the expanded conspiracy charge and the addition of a separate obstruction charge against Mr. Reichberg.

I understand that Mr. Grant and his counsel are making conscious strategic decision by not filing that motion, and I appreciate that they've consciously chosen to forego the opportunity to bring such a motion.  I recognize this as a strategic decision by Mr. Grant and his counsel, and I will not displace it.

I am making this record, however, to make it clear that that is a conscious strategic decision by Mr. Grant and his counsel, and, therefore, that any consequences from the decision not to seek a motion for severance with respect to the superseding indictment which, as I had said earlier, I believe does expand the scope of the allegations that will rest with Mr. Grant as a reasonable strategic decision.

So the next issue that I would like to discuss is what's described as the Lichtenstein evidence in Mr. Reichberg's letter.  I've reviewed the materials related to that.  I would be happy to hear further arguments from the parties with respect to it if you would like to offer any.

Counsel for the United States?

MS. RAVENER:  Your Honor, I would just note in light

I4NQGRAc1

of defense counsel's letter last night that, we don't believe it accurately characterizes the Court's ruling.  Of course, the Court gave us only the headline portions of its ruling, so if we're mistaken, I'm happy to address that as well.  But our understanding was that your Honor ruled that this evidence was admissible in full as to defendant Grant.

THE COURT:  That is correct.

MS. RAVENER:  Thank you, your Honor.

And that the concern was that the full scope of the evidence could cause spillover prejudice at a joint trial.  So our submission is catered to address that specific issue, and we believe that by offering a smaller subset we've essentially eliminated any concern of unfair, undue spillover prejudice as to Mr. Reichberg.

THE COURT:  Thank you.

Counsel for defendant Reichberg, any additional argument on this point?

MS. NECHELES:  Your Honor, as we addressed in our letter last night, we think this is a reargument.  If your Honor wants to get into the substance, which we don't think should be occurring now, we would ask for an opportunity to submit something.  We don't believe that there is anything added in their brief.

THE COURT:  Thank you.  Understood.

I do not view this issue as one that is improvidently

raised.  I think it is perhaps untimely raised because I expected any motion for clarification of the scope of that ruling would have been interposed, I think, as of Tuesday two weeks ago, but I anticipated that the United States would make such a motion for clarification.  They told me that they would on the day that we discussed the issue.

I understand that this is an application for me to consider what I will call a more targeted set of evidence.  During our last conference, the United States told me that they thought that additional information might be helpful for the Court to evaluate this issue, and they suggested that they bring more information before the Court with respect to the evidence at issue.

Mr. Bell, if I recall correctly, raised a portion of the issues that are discussed in their most recent letter during that initial conference.  So I don't view this within the frame of a motion to reconsider.  They are not asking me to step away from my decision as a whole.  Rather, I understand this is a motion or an application for the admission of a more limited pool of information regarding Mr. Lichtenstein, which the government believes as a portfolio will not be as prejudicial to Mr. Reichberg as the entire parcel of information that they previously proposed to introduce.

So I am going to consider this application substantively.  If you'd like to offer additional argument with

that in mind, I invite it.  Counsel for both defendants.

MS. RAVENER:  And, your Honor, if I may just be clear about the government's position.  Our position is that this evidence would be admissible even at a trial solely of Mr. Reichberg.  So aside from the question of prejudice under Rule 403, we believe this evidence is relevant and admissible as to Mr. Reichberg.

THE COURT:  Thank you.  Understood.

It was always relevant as to both defendants.  The question was the degree of spillover prejudice with respect to other acts by Mr. Grant for a joint trial with Mr. Reichberg.

Counsel for Mr. Reichberg.

MS. NECHELES:  Your Honor, we'd ask for some time to put in a submission in on this then.

THE COURT:  Thank you.  That's fine.  I'd be happy to give you more time to submit something.  When would you propose to submit that?

MS. NECHELES:  By Friday, your Honor.

THE COURT:  Thank you.  Can I ask that you do it sooner?  I think that most likely, assuming that we are proceeding as scheduled, you will want to know the answer to this question before we begin on Monday.  Unfortunately, I think that we will most likely need to gather together again before that, with respect to perhaps just this issue and other issues.

If you could send me any response sooner than Friday, we'll be able to resolve this issue by the end of the week. Let me propose that you submit any supplemental briefing on this issue by tomorrow at 2:00 p.m. I will ask the United States to submit a reply, if any, by the following day at the same time. That way the issue will be fully briefed by midday Wednesday.

MS. NECHELES: That's fine, your Honor. Just to clarify, my understanding is the trial is starting on the 7th?

THE COURT: I'm sorry. That is correct. Good. So that will give us more than adequate time.

So let's talk now about the next issue in the letter raised by Mr. Reichberg. That relates to the redactions to NYPD financial documents and personnel records. Is there any further argument with respect to this issue? Let me put it differently.

Counsel for defendants, why do you believe that the information that's been redacted by the United States with respect to these limited categories of information are not appropriate?

MS. NECHELES: Your Honor, there are two categories really of information or documents where information has been redacted. The first has to do with New York Police Department equipment. It is our position that this equipment is required to be -- the helicopters in particular and also the boats are

I4NQGRAc1

required to be in use for a certain amount of time every day, and that during that time they fly around or drive around, and it doesn't really matter where they go.  And that is relevant to show that we were not misusing resources.  These resources are just lying around.  We are not costing the government any money.  I know the government may disagree with that, but that is part of our defense, and that is the information they're redacting.

THE COURT:  Thank you.

Can I ask to help contextualize this issue how it is that this evidence is going to come in?  In other words, will there be a witness that can bring in the basic facts the defense is expecting to bring in without requiring the disclosure of information, which I think the NYPD reasonably asserts should benefit from, I will call it, a law enforcement privilege.

If this evidence is coming in through a witness, can the defense ask that witness the questions necessary to elicit the basic facts that Ms. Necheles is referring to?

MS. LONERGAN:  Yes, your Honor, there will be at least one witness with respect to this point.  We anticipate probably calling more than one witness who is familiar with the use of NYPD boats and helicopters, and they can inquire of that witness.  And so that will be at least able to go to this issue.

In addition, we have documents that will show the use in particular of the helicopter on the day in question, so that is a more specific as to this particular day. But again, I think what the police department is more concerned about. They understand, of course, there will be testimony in open court, but it has to do with a document that could be in their mind shared publicly and misused, which I think they view somewhat different than testimony. I don't think we would object to these types of questions as put to a witness rather than the information as redacted in the document.

THE COURT: Thank you.

MS. NECHELES: Your Honor, can I just note? We can't ask questions as a defense attorney as a matter of competence. I mean, I don't just ask witnesses that I don't know the information. And if the witness gives me an answer that is what I believe untrue, I need a document to cross-examine.

The government is keeping us from having the material that's directly responsive to the cross. We're talking about a column that says "average hours used per day." I really don't understand how -- and this is confidential document that we are allowed to share with anyone anyway. So I am failing to see how this is imperiling the City of New York, particularly if there was going to be testimony about it anyway. And I need this information for our defense. This is critical to our defense, and I can't just rely on maybe the witness will give

I4NQGRAc1

me the answer.  I'm entitled to have the document which have that information, particularly when it's part of the prosecutor's team.  This is exculpatory information.  This is information that goes to the heart of our defense.  They have to prove we misused -- we cost the City $5,000 a year.  If there helicopter is just up there flying around going whatever, we're not costing the City anything.

THE COURT:  Thank you.  Understood.

Counsel for United States, how do you respond?  I'm particular, I'm interested in your views regarding what the risk is in the event this information is disclosed to counsel and defendant subject to the provisions of the confidentiality agreement and order.

MS. LONERGAN:  Your Honor, I think we have set forth the opinion of the NYPD with respect to why they don't want this information made public.  And then I think this maybe goes to the issue that we also said we wanted to raise with the Court which has to do with the 3500 protective order and the fact that in our mind the defense counsel inappropriately published something that was protected by the 3500 protective order.

THE COURT:  Thank you.  We will come to that issue separately.

So with respect to the first set of redactions that defendant contests; namely, as I understand it, the redactions

I4NQGRAc1

to the column in the chart for FY 17 rates for NYPD equipment for average hours used per day. That's the column that is at issue, right, Ms. Necheles?

MS. NECHELES: It's first '15, '16 and '17. And with respect to 17, there are two footnotes as well. There's also average mileage, but I don't really care about that.

THE COURT: You say '15, '16 and '17?

MS. NECHELES: Yes, fiscal year '15, '16 and '17. In addition, in '17 there are two footnotes. Should I hand this.

Up to your Honor?

THE COURT: Please. I only have the FY '17 exemplar.

MS. LONERGAN: Yes, your Honor. That was all we had at the time that I think these papers were filed.

If I can just clarify with respect to the actual date in question of the helicopter and boat, which was August 15, 2015, defense counsel will have all of the information for that particular day. This chart covers a much broader time period, and so we do think that that strikes the appropriate balance by giving them the information they need as to that particular day they that can use the cross-examine the witnesses about the activities of the boat and helicopter for that day.

THE COURT: Thank you.

Ms. Necheles, I understand that you are not planning to publicly disclose the exhibit itself, but, rather, that it's a vehicle that you expect to use for examination of the

I4NQGRAc1

government's witnesses.  Is that accurate?

MS. NECHELES:  I believe the government intends to put it in evidence.  I may put it in evidence, but I don't intend to use it anywhere else.

THE COURT:  Thank you.  Fine.

MS. LONERGAN:  Your Honor, sorry.  The issue is putting it in evidence.  As Ms. Necheles has said, she can use it for cross-examination and it seems like that may strike a balance where we could give her an unredacted copy to use for cross-examination with the witnesses, but that the document introduced into evidence which is part of the public record would be the redacted version.

THE COURT:  Thank you.  Understood.  That's an issue we can discuss.

At this point the question is the extent to which the defense is entitled to receive unredacted versions of these records.  I believe that they are.  This information is significant for their preparation of their defense.  When I'm referring to "this information," I'm referring to redacted columns for "average hours used per day" on whatever the footnotes are on Page 22 for the fiscal 17' rates for NYPD equipment.  I don't understand the defense is contesting the redactions to the annual mileage column.  These documents should be provided without those redactions to the defendant subject to the terms of the existing confidentiality agreement

I4NQGRAc1

which limits their public disclosure.

To the extent that the defense or the government seeks to introduce unredacted versions of these records into evidence at trial, we can discuss the issue at that time. But I believe this is necessary for the effective preparation of their defense. The NYPD legal counsel's indirect explanation of the concerns here do not in my view justify redaction of that information for that purpose.

MS. LONERGAN: Your Honor, if I may beg the Court's indulgence. We don't have unredacted copies. Based on our experience, we think it could help expedite the process of getting unredacted copies if the Court actually issued some type of order that we could forward to the NYPD.

THE COURT: Thank you. I would be happy to enter an order. I have expressed it less specifically in my comments earlier. I am going to order -- I am ordering the NYPD to produce unredacted versions of these records which the United States, which the United States can in turn produce to the defendant. When I say unredacted, I'm referring to the average hours used per day column in the footnotes for the physical year '17 charts. If the NYPD wishes to appear to contest that order, they can decide whether or not to do so.

Good. So that addresses the first issue.

MS. NECHELES: Your Honor.

THE COURT: Yes.

I4NQGRAc1

MS. NECHELES:  May I pass up the other batch of second redacted documents as well.

THE COURT:  Please feel free.  I have the exemplars that were attached to the government's April 17 letter.

I have much the same question as the gating question for the defense.  The government has described the nature of the redactions that they have made here which include personal information for certain categories of officers, including home addresses, blood types, social security numbers.  What's the position of the defense respect to why those redactions are inappropriate?

MS. NECHELES:  Your Honor, I don't care about his birthday, religion, where he lives, race, any of that, relationships, home phone number.

What I do care about are the following:  On fire license application on the first one in front of your Honor on the top, the government "redacted who counseled the firearms license."

THE COURT:  Can you point me to those?

MS. NECHELES:  Right at the bottom, the last line on it says, "canceled by blank.  Finalized by blank."  It seems like that might be a relevant issue with respect to what was done.

THE COURT:  I'm sorry.  Can you help focus me on what this is?

MS. NECHELES:  So, I understand it, this is a firearms license and permit and is going to be, as I understand it, an issue that is one of the firearms or licenses that they will say at trial was improperly given or obtained.  And I don't know what this says.  It seems it may be that this is an officer who canceled this firearm.  I just don't understand why that kind of information would be redacted.

With respect to the other documents in here, these are personnel profiles or personnel records.  These, as I understand, it are police officers were the government will say were improperly promoted or that our client obtained a promotion for on their behalf or in transfer.

THE COURT:  I'm sorry, so all of the other individual police officers allegedly benefited from some largesse from Mr. Reichberg is the government's theory of the case?

MS. NECHELES:  I believe so, but, your Honor, I want to point out too.  These are not allegedly bribes.  They are just coming in as part of the massive amount stuff the government is seeking to dump in the record.

I don't think these are bribes.  But what the government says is Mr. Reichberg asked to have these people spoke about having them transferred or promoted.  If that's so, I think we are entitled to show that these people were promoted because they deserved to be promoted or transferred because they were good.  And there is nothing wrong with saying, "Oh,

this person is a good cop, he should be promoted" to your friend.  And that is -- and that it wasn't some sort of favor, scheme or anything wrong.

What the government has done here is take away all of that preparation from the defense, all of it.  So we are not asking for their personal date of birth or sex or ethnicity or anything like that.  We don't really care about that.  What we do care about is the extensive information that is taken out about their work history.

THE COURT:  Thank you.

Counsel for the United States.  Can I hear from you, just as a background fact to help me understand the intended use of this evidence.  Can you comment on Ms. Necheles' description of how the defense anticipates this evidence will be used?

MS. LONERGAN:  Yes, your Honor.  That's not correct. We do not intend to argue that Mr. Reichberg -- that these individuals were unqualified for promotion or that Mr. Reichberg got these individuals promoted as a favor.

We obtained these documents in connection with our investigation.  It is true that some of these individuals' names and tax ID's are in Mr. Reichberg's telephone, but we are not arguing in any sense that these individuals were unqualified for promotion and that Mr. Reichberg arranged to have them promoted as basically a favor to them.  So I think

that those are a separate category of documents than the firearms licenses that we can talk about separately.

THE COURT:  Thank you.  Can I ask then why these records are material and what the involvement of these officers allegedly is in the charged conspiracy?  I will say I ask this question both to help me evaluate the issue that Ms. Necheles is bringing to the Court but also to understand whether we are going to be subjected to an extended period during the trial in which the government introduces evidence about officers who are not directly involved in the charged conspiracy.

MS. LONERGAN:  Your Honor, if I can, I think we need to break it down a little bit.  There is a category of officers we describe them as tangentially involved.  They have more redactions.

The evidence that the government will seek to introduce, if any, is that Grant asked for their transfers, and to the extent that they were transferred, that Mr. Reichberg may have helped effectuate those transfers through Chief Harrington.  So basically what we see is we see text messages regarding that.  We do not expect to put on any sort of extensive evidence regarding any of these officers.

In addition, there is a second category of officers from which we have done many fewer redactions.  Those are officers who are more centrally involved in the charged conduct.  For example, some of them were intercepted on the

I4NQGRAc1

wire.  Some of them have extensive conversations with Mr. Reichberg over his devices.

For those individuals we really took a much lighter hand with respect to redactions because we think that they are more relevant figures in this case.

In addition, I think the Court also asked a question about why these documents were produced and their relevance. Your Honor, there have been a lot of conferences where the Court -- and defense has concerned production about NYPD documents, and Court has set deadlines.  Honestly, out of an abundance of caution, we think many of these documents may not be necessary.  They may not be relevant.  For example, we may never end up speaking about any of these individuals during the pretrial, but we wanted to comply with the Court's concern about when we were going to produce NYPD documents.  They were in our possession, so we decided it would be given over to defense counsel, but given that limited use, we thought that these redactions were appropriate.

THE COURT:  Thank you.  Understood.

MS. NECHELES:  Judge, can I address this?

THE COURT:  Please do, Ms. Necheles.

MS. NECHELES:  I believe there are approximately 15 different -- so, these are samples.  What I understand the government to be saying is they will be bringing Ms. Holland to trial, but because they think they are going to do it lightly,

I4NQGRAc1

they are just going to touch on it, they think that means we don't have to do anything about it.

THE COURT:  Thank you.  Understood.

I don't understand their statement in the same way. My understanding is that the government produced these records related to "tangentially involved" people out of an abundance of caution, despite the fact that they may not introduce any evidence about these people.

The question I have for purposes of this conversation which relates to the propriety of the redactions, is why a higher degree of redaction is appropriate for those people who are only tangentially involved.  In other words, why are these people's privacy interests entitled to, I'll call it even greater protection than those of the other officers who are more directly involved?

Take aside the issue whether or not this just puts in front of the defense more information that they need to go through, which may not be relevant.  But that's not the issue that we are discussing here.  The issue is whether the redactions are justifiable.

Counsel for the United States, understanding the defendant's concern; namely, that they would like to review everything, even if the government says that they are unlikely to use these particular records, why should these redactions be maintained for the people who are tangentially involved?

I4NQGRAc1

MS. LONERGAN:  One moment, your Honor.

THE COURT:  Thank you.  Please take your time.

MS. NECHELES:  Judge, while they are conferring, could I ask also can we have some specification of which people they will be eliciting evidence about that were transferred to see what the volume is.  Your Honor, we believe that there are going to be a lot of side issues like this which are going to be confusing and not really relevant to anything if these people were not allegedly bribed.  But it will be confusing to the case and will greatly lengthen the trial because if they are not bringing in that they were transferred, we don't need to get into this.  But if they are, we may have to show that these people were transferred correctly and elicit evidence on all of that.

THE COURT:  Thank you.  I think we have heard some helpful clarification on that point from the government now. In my introductory comments to that question, I was expressing some concern about the possibility of a diversion with respect to these issues that might waste the jury's time or cause confusion.

But as I understand it, the government right now is not proposing to bring in evidence related to the "tangentially involved" people.  They provided this information out of an abundance of caution.  That said, we need to figure out whether or not redactions are appropriate here.

I4NQGRAc1

MS. NECHELES:  Your Honor, I hear what you're saying. I don't know "tangentially involved" means.  I don't know which people they are planning on and which ones they're not.

THE COURT:  The ones that have redactions.

MS. NECHELES:  All of them are extensively redacted.

THE COURT:  Thank you.

MS. RAVENER:  Your Honor, if I can attempt to provide some more information to the Court.

THE COURT:  Please do.

MS. RAVENER:  These file are the entire personnel record essentially, the summary of the personnel record for these members of the service.  They contain incredibly personal preparation that has no bearing on the case.  The specific relevant to the "tangentially involved officers," I can explain to the Court very briefly.

There are approximately five officers who we have records demonstrating.  Mr. Grant specifically asked Mr. Reichberg to have transferred.  Not promoted, so it had no bearing on the merits of their motion or anything like that, but requested very specific transfers to specific precincts, and Mr. Grant's requests came through.  That's why we produced this records, your Honor, they demonstrate after Mr. Grant made those requests, those changes happened at the NYPD.  And there is evidence in this case that those changes were effectuated promptly because Mr. Reichberg was able to leverage his

relationship with Mr. Harrington, a co-conspirator, in order to make those moves happen. So it's an unusual thing that we're observing here. Mr. Grant a high-ranking in the police department is going to a civilian, Mr. Reichberg, in order to have people moved around at the NYPD. That's the relevance of the record.

THE COURT: Thank you. Understood. I appreciate the purpose for which the government intends to introduce evidence of the existence of these people and the transfers.

Having said that, the only issue before me now is whether or not these redactions should be maintained. And it is not's parent to me why defense counsel is not entitled to review these records.

This may again cause the haystack-needle issue that has been alluded to previously in the case. But that is not the question that is presented here. The question is different.

MS. RAVENER: Your Honor, if we may be clear about exactly what in these records the Court believes may be relevant. These records include, for example, the medical history of these individuals, their employment evaluations. As we said, their employment evaluations. As we said, their blood type, their religion, their personal contact preparation. I don't see how any of that is pertinent. If we could be more specific about what is exactly the Court believes should be

I4NQGRAc1

unredacted here?

THE COURT: It's impossible for me to tell, Counsel, because it's all redacted, so we have a couple of choices.

I am not going to make a determination regarding relevance. I'm either going to order you to produce it or I'm not going to order you to produce it. So the question is whether or not there are redactions that are appropriate here. No apparent effort has been made to limit the redactions to adjust, I'll call it, medical history. Instead, there are big blocks of black in the documents that I have been presented with.

MS. RAVENER: Your Honor, if I may, just to be clear, we have left intact the headings for each area that was redacted. So it could should be apparent to the defense what kinds of information was removed. We are willing to work with them if there are specific areas that they believe they need, but those are the reasons for the redactions, your Honor.

THE COURT: Fine. Let's pick one. We will go through each one in turn and we will determine why the information is inappropriate to be provided to the defense in connection with this set of issues and what the asserted privacy concerns are. If we can go through heading by heading.

MS. NECHELES: Can I suggest, your Honor?

THE COURT: Yes.

MS. NECHELES: I think I have been pretty clear. We

I4NQGRAc1

don't want the personal information.  We do want employment information.  I suggest right after this court appearance we will sit with the government and we will see if we can work it out, and to any categories that the government continues to believe should be redacted that we disagree, perhaps after court, the government and we could submit a short letter to the Court today on that.  Because the documents are all different types.  They don't all have the headings there.

I have said a bunch of times I don't want their social security number.  I don't want their medical information.  I'm looking for job-related preparation, commendation summaries.

In addition, your Honor, two other things:  I would ask that Mr. Grant be permitted to see this.  The government has provided these to us on the basis that they cannot be show to the defendants.  I cannot prepare for trial.  It is depriving my client Mr. Grant of his due process right if they cannot see these documents and to prepare the defense.  I do not have the police department documents.

In addition, your Honor, Ms. Ravener said again that there are five people who they will say at trial were transferred on Mr. Grant's request.  I ask those be identified.  There are numerous people he discusses with Mr. Reichberg on the phone.  Mr. Reichberg was a police buff.  All he did was talk about internal police gossip.  So if I don't know which five those are, I can't prepare a defense.  I should be able to

show that he asked for lots of people to be transferred and none of those got transferred; that this was all gossip.  I should also be able to show those five had put in applications or maybe they put in applications years before and they had been requesting it.  I can't do this on the fly at trial.  It all takes preparation.  So I ask again that those five people be identified.

MS. RAVENER:  Your Honor, this is an example of an area where if defense counsel had simply come to us and attempted to work this out, we'd be happy to do so, and we're happy to do so at the close of this conference.

THE COURT:  Good.  Thank you.  I appreciate that.

MS. CAPPELLINO:  That means the five will be identified --

MS. RAVENER:  Your Honor, if I can clear.  I don't believe we marked this attorneys' eyes only, so we're confused by that.  That is something we will clarify with defense counsel as well.

THE COURT:  Thank you.  I am happy to clarify that issue.  I don't see a basis to prevent the disclosure of these records to each of the individual defendants.  Particularly given the nature of this case, I believe that it is important for them to be able to consult with their counsel and to help their counsel understand the meat of these records and suggest lines of an approach to counsel.  I understand this not to be

an issue because these documents were not designated as attorneys' eyes only based on Ms. Ravener's proffer.  That said, if they had been marked as attorneys' eyes only, I would order their disclosure to the defendants.

With respect to the parties proposal to discuss following this conference, I would welcome that.  We do need to get some resolution with respect to these issues, however.  So let's take up each of these things briefly in turn.

First, Ms. Ravener, do I take from your comment that you are prepared to disclose to the defendant who the five people at issue are here?

MS. RAVENER:  Yes, your Honor.  That's no issue, and it should be apparent from the discovery in any regard.

THE COURT:  Good.  Thank you very much.  Which respect to other issues, I think that there is clear grounds for the parties to talk about appropriate redactions here.  There are pages with headings that say "medical history report."  There are other pages that refer to skill summaries or monitoring summaries and the like, and training history.  These are categories of information that I think can be the basis for agreement parties.

I'm going to direct that you have that conference today and that you send me a letter regarding any remaining disputes related to the redactions by the end of the day today.  When I say "end of the day," I mean end of the day lawyer time.

If there are any remaining disputes, please me know with respect to the personnel records.

With respect to the firearm license and permit issue that was brought to my attention at the outset of the conference, I haven't heard what the basis is for the redactions on the first page of that first license and permit, which is the reference to a "cancellation by" and "finalize by."

Counsel for United States, can you tell me?

MS. RAVENER:  Again, your Honor, those small redactions we have no problem removing.  If defense counsel had called it to our attention separately, we would have addressed it.

THE COURT:  Thank you.  I think that is an appropriate response and I appreciate the government's willingness to work on this issue with defendant.

I am going to take aside the redactions-related issues because I believe that we just addressed them all.  If I see no letter with the remaining issues on the redactions, I will understand that they have been resolved, and I will thank you for it.

The next issue on the proposed list we need to discuss here is by counsel for Mr. Reichberg as a review of spousal communications.  I am prepared to rule on that issue.  I welcome any further arguments by the parties with respect to it

I4NQGRAc1

if either party would like to offer any.

Counsel for defendant first?

MS. NECHELES:  No, your Honor.

THE COURT:  Thank you.

Counsel for the United States?

MS. RAVENER:  No, thank you, your Honor.

THE COURT:  Thank you.

Give me one moment, please.

(Pause)

THE COURT:  So first, with apologies, the analysis is a little bit involved.  The end result is that I'm granting in part and denying in part the defendant's motion on this point.  I am not going to direct that this information containing any potential marital communications be returned directly to the defendant.  I don't believe that's warranted.

But I do think that they should be reviewed in the first instance by a taint team rather than by the prosecutors directly involved in the prosecution of the case.  I will give you the reasoning that yields that result now.

MS. RAVENER:  Your Honor, if I can just address one thing regarding your Honor's position.

THE COURT:  Please.

MS. RAVENER:  With respect to any need for a taint team, the review has already been completed at this stage.  I can tell you that there was not a close look at any potential

marital communications during that review, but we don't intend to review those communications further. So I just wanted to address that for the Court before your Honor goes any further.

THE COURT: Thank you.

Can you give me more detail about what the government has done and that will inform where I'm going to come out on this. The basics with respect to this issue I think are relatively straightforward. There is a marital privilege. I will describe in more depth how it's defined.

The question presented I think at the outset was whether this should be treated like attorney-client related materials or if it is merely and evidentiary issue that relates to information that should be or can be produced at trial. There is really no clear Second Circuit guidance that I have been able to find on this point.

However, looking at other cases, as I've said, I was about to conclude that the best practice would be to have it reviewed by a taint team in the first instance, so that the confidential information did not affect the decisions by the team that's prosecuting Mr. Reichberg. So that conclusion is now essentially valueless.

Tell me what it is the government has done and we can use that information to craft whatever the appropriate approach is now going forward. I take it at the outset that the government is not proposing to use in evidence at this trial

I4NQGRAc1

any information that is covered by the privilege.

MS. RAVENER:  That's correct, your Honor.  And I don't think defense counsel has pointed to anything in the identified material that would fall into that category.

THE COURT:  Thank you.  Did the government --

MS. NECHELES:  Your Honor, I didn't understand what was just said.

THE COURT:  Thank you.

Ms. Ravener, could you repeat yourself, please?

MS. RAVENER:  Yes, your Honor.  I understood the Court's question to ask us whether we intended to offer into evidence records, documents or information that could be deemed to be covered by the confidential marital communications privilege.  Is that correct, your Honor?

THE COURT:  That was my question.

MS. RAVENER:  And my response was that the government does not intend to offer any such communications at trial, and that I don't believe the defense has identified any such communications in the subset of identified material marked by the government that it specifically objects to the introduction of.  If they do, then certainly we'll address that at that time.

THE COURT:  Thank you.

Now, were there documents that the team concluded were covered by the privilege and that were set aside by the team?

MS. RAVENER:  Your Honor, I can tell you that defense counsel raised this issue after we had already conducted the review of about 34 of the 35 devices to the extent they were accessible, your Honor, and we were already in the process of reviewing the last one.  It's not our usual practice to do this.

THE COURT:  I'm sorry, let me just make this point for the record.  I understood the government had completed their reviews with respect to all of the devices other than device 19 and, therefore, any relief would essentially be limited to that because the bell had been rung with respect to the other evidence before the issue was raised.

MS. RAVENER:  Thank you, your Honor.  And during the pendency of this issue before the Court, the government continued its review.  What we did was -- I don't believe anything was marked or specifically for the spousal privilege. What we did is simply really constrain ourselves in terms of reviewing any communications that appear to be solely between Mr. Reichberg and his wife at that time given the pendency of this issue before the Court.  It is our position that those materials can be reviewed to see whether the privilege is satisfied but we took a more conservative approach here.

THE COURT:  I'm sorry.  Just to be clear, the government's approach, is it correct that the government's approach regarding communications between Mr. Reichberg and his

wife was to set them aside immediately following the government's determination that they were such, and that the government did not review the substance of those communications after having made that determination?

MS. RAVENER:  Yes, that's correct, your Honor.  I'm just noting -- I think you had asked, your Honor, whether they were marked privileged.  There wasn't a process that looked like that.

THE COURT:  Thank you.

So can you tell me how it was that the government made that initial determination that the communications were covered by the marital privilege without also reviewing the substance of the communications?

MS. RAVENER:  Your Honor, as I noted, while we maintain in our letter that we have the right and ability to review those communications, in conducting the remaining review that was left of this one device, to the extent that we were able to run a search and identify a particular record as responsive to the search but only having Mr. Reichberg and his wife as the parties to it, we in general did not look at the substance of the communication.

THE COURT:  Thank you.

Can you expand on those words, the "in general"?  Did you or did you not look at the substance of the communications that met the criteria that you just described?

I4NQGRAc1

MS. RAVENER:  Your Honor, the way that the program works, without boring the Court with too much detail, it is impossible in response to a search to completely avoid having any data show up.  But in general we did not then click on the link to see what exactly it said.  It appeared to be solely a communication between Mr. Reichberg and his wife.  Can you tell me what preparation did appear that you would not be required to "click through to" after the search was conducted?  What did you see after the search was complied with the parameters you described.  Your Honor, the way the program would work, it would typically bring up the parties to the communication and then one line for where the search term hit or the initial line of the text or chat communication, and we just didn't examine those records here for the most part.  So that's the approach we took.  I don't believe that any communication solely between Mr. Reichberg and his wife were identified for this device.  If they were --I'm sorry.  Can I just make sure I'm clear about that?  No such communications were disclosed for device or found with respect to device 19.  Is that accurate?  Let me be clear, your Honor.  Communications between Mr. Reichberg and his wife are on all of these devices.  In the government's execution of the search warrant, the renewed warrant, I don't believe we actually identified as responsive to the warrant any communications that were between solely Mr. Reichberg and his wife because we took a very conservative approach here.  As a

I4NQGRAc1

result, I don't believe any such communications have been turned over to defendant Grant. If I'm incorrect about that, we will, of course, address it right away with defense counsel if they want to assert a privilege claim, but I think that in general here, your Honor, we were looking for other kinds of information. It's very difficult to completely screen out any particular party from a cell phone. We are conducting searches, and I believe that there were hits for some of those search terms that were contained in communications between Mr. Reichberg and his wife, but I know that in conducting my review, I did not personally examine those, and I don't believe the agents really did either.

THE COURT: Thank you. Good.

Counsel for Mr. Reichberg, what do you say in response? The remedy that I was going to suggest here may essentially be meaningless given that the government has conducted a review. I take some comfort from the fact that they did not review the substance of communications that were between Mr. Reichberg and his wife to the extent that there are any that came up in the search.

What's your view and what should we do now?

MS. NECHELES: So, your Honor, I think that -- I don't think the defendant has to assert spousal privilege or attorney-client privilege for the government to know it exists. When they seize materials, it's their job to make sure. They

totally violated their job in this case giving massive amounts of confidential communications, not just to the other defendants in this case but to defendants in other cases, and clearly reviewed those as well. I believe in the identified information on this phone, there is at least one extensive chat that was produced -- and this is after we had objected to this -- which is a chat between Mr. Reichberg and his wife.

THE COURT: I'm sorry, was it just between Mr. Reichberg and his wife?

MS. NECHELES: I don't have this information in front of me, your Honor. I believe that it was -- your Honor, I might have misspoke before. I think that they did not give the devices to people in other cases, but I believe they did give it to the co-defendants in this case.

So this goes back to, you know, our complaints before about the certain level of sloppiness of production and disregard of Mr. Reichberg's rights.

THE COURT: Thank you.

I have concerns, generally speaking, as well regarding the process here. Marital communication privilege is one of long-standing. The issue presented to me at this point, however, is whether there is anything that I can do to modify what was done in the past with respect to all the devices other than device 19. I think the answer to that is no.

With respect to device 19, which is the only device

that the government reviewed following the time that the defense raised this issue, I understand that the government took a conservative approach and that whenever the search that they conducted yielded documents that were communications between Mr. Reichberg and his wife alone, that they did not drill down to review the substance of that communication, which is less protective of Mr. Reichberg's and his wife's privilege than my proposal was going to be; namely, imposition of a taint team.

But given that the government did not review the substance of those communications and, therefore, I understand is not relying on them in the development of its case, and given that they are not proposing to introduce evidence of such communications at trial, I don't believe that I can or should do anything more to penalize the government's conduct here.  I think my comment would be that it is of a privilege of long-standing, and I think it is appropriate to respect it in document review.  Here, I don't believe that there is anything more that I need to do in order to protect the substantive rights of the defendant with respect to this issue.

Can I be clear, however, that regarding Ms. Necheles' last comment, is it accurate that the government did in fact present an extended chat between Mr. Reichberg and his wife as among the documents that were responsive to the warrant.

Any party?

MS. NECHELES:  I'm pretty certain it's accurate, your Honor.  My colleagues here in the court who have reviewed it say that that is.

THE COURT:  Thank you.  Can you identify that record for me, any lawyer present?

MS. NECHELES:  Your Honor, we'd have to send a letter later.

THE COURT:  Thank you.  Please discuss it with the United States.  The scope of the marital privilege, I think should not be controversial.  The elements of it are extremely straightforward.  I would hope that the parties would have no difficulty identifying when the privilege applies.  Please raise it to me if there are any additional issues that I should address with respect to this.  I will spare you my extended analysis of the issue.

Let's talk about Mr. Reichberg's motion then to sever Count Seven.

First, any additional argument with respect to this issue?  First, counsel for defendant Reichberg.

MS. NECHELES:  No, your Honor.

THE COURT:  Thank you.

United States?

MR. BELL:  Not unless your Honor has questions, your Honor.

THE COURT:  Thank you.  I realize I need to also come

back and give you the full rationale with respect to the other motion in limine decisions which I hope to do later in today's conference after we've gone through the rest of the agenda and perhaps following a short break.  I'm going to try to integrate part of my analysis with respect to those existing motions in limine as I consider the motion to sever Count Seven because I think it is helpful for complete understanding of the issue.

Again, to preview the end result here, I am going to deny Mr. Reichberg's request to sever Count Seven. Mr. Reichberg's request to sever Count Seven is denied. Ms. Necheles has information that she believes would be useful to put before the jury potentially on Count Seven.  I recognize that.  But I want to begin this analysis with the fact that this issue pertains not only to Count Seven but also to the conspiracy count against Mr. Reichberg.  To the extent that his counsel has evidence that will go to show Mr. Reichberg's state of mind, I expect that it would also be pertinent to the inference that the United States will ask the jury to make based on the evidence regarding Mr. Reichberg's consciousness of guilt.  As I believe I previously informed the parties, I believe that this evidence should come in with respect to the previously charged offense, even without the addition of Count Seven.  That's because it's evidence of Mr. Reichberg's alleged consciousness of guilt.

So even if I was to sever Count Seven, the government

would be permitted to introduce the evidence regarding his brother's conduct in order to show his consciousness of guilt. I'm going to review my reasoning with respect to the original sets of motions in limine, then I'm going to talk more specifically about the currently pending request that I sever Count Seven.

The government has proffered that on the day Mr. Reichberg was arrested, he appeared to witnesses to be expecting their arrival. More significantly, agents found Mr. Reichberg's brother leaving the home, and when they searched him, they found stacks of business cards and electronic devices that the government asserts contained evidence probative of Mr. Reichberg's offenses. The government seeks to introduce this evidence to demonstrate Mr. Reichberg's consciousness of guilt. Such evidence is relevant and is properly admissible to illustrate Mr. Reichberg's intent. It is direct evidence of the originally charged offense. Clearly, it is also direct evidence of the newly charged offense in Count Seven.

Let me address two of the arguments raised by Mr. Reichberg with respect to this evidence under Rule 403 in connection with the first set of motions in limine. Now that the new charges has been added, the probative value of this evidence is soundly secured. But I want to emphasize that it had strong probative value, except it is true with respect to

Mr. Reichberg's consciousness of guilt regarding the charge in the prior indictment, the evidence is not in my judgment, after weighing the evidence based on proffers by the parties, properly excluded under Rule 403.  Mr. Reichberg in his initial set of motions in limine, raise two basic arguments when presented with this issue in the context of the prior version of the indictment.

First, he argued that the government's proposed inference that Mr. Reichberg asked his brother to remove the items has insufficient factual basis.  He claims that, if asked, he expects that the brother would testify that is not the case.  Whether or not the government's evidence will support its contention will be tested at trial.  I do not have a basis now to conclude that the government cannot prove its charge.  That is the question to be tried.  In my view, the prejudicial value of this evidence accepted as true is outweighed by its probative value.

In his motions with respect to the prior indictment, Mr. Reichberg framed this issue as one related to what Mr. Reichberg knew at the time regarding the likelihood of his arrest on that day.  His counsel expressed a concern that they could testify on that topic since they were advising him on the issue at the time of the arrest.  When I say that they expressed this concern, at that time it related to the previously charged conspiracy charge alone.

Of course, Mr. Reichberg's counsel are not the only possible witnesses with respect to the issue. As they point out, Mr. Reichberg's brother can testify about what he was told by his brother. Mr. Reichberg asserts that the government has not interviewed him. Mr. Reichberg himself could testify himself about what he understood if he chose to testify.

Counsel for Mr. Reichberg proffers that the evidence that she would share to refute the suggestion that there is a tip publicly in the original set motions in limine, that there was a tip consists of testimony that Mr. Reichberg told her that he believed that he was being followed; that he believed a police car was parked in front of the house; and that he was going to go outside of the house so that the FBI wouldn't scare his children. (Reichberg motion at 6-7). Counsel asserted in that motion that that was the testimony she would present as a witness. I have since received a separate ex-parte communication regarding the asserted testimony. I am not describing the content of that ex-parte communication.

All of the originally proffered testimony about what Mr. Reichberg told counsel seems to be hearsay, and it's not clear to me on what basis counsel would offer those statements by Reichberg were she to be called as a witness. Again, I'm not commenting specifically on any additional testimony that was described to me in the defendant's ex parte submission.

Mr. Reichberg's April 10, 2018 letter states that

there is no conflict of interest for counsel as a result of the possibility that counsel might testify.  The issue, if any, arises under Rule 3.7 of the New York Professional Rules of Responsibility.  No one has requested that I disqualify counsel on the basis of the prospect that she might testify.  And counsel has significantly not requested leave to withdraw.  Indeed, counsel has not said definitively that she will testify about the communications between her and her client in this or any other case.  It's raised only as a possibility.

I do believe that I must disqualify counsel because there is no conflict of interest between her and her client.  I recognize fully the situation creates a difficult decision for Mr. Reichberg and his counsel.  If Ms. Necheles wants to testify but believes she cannot do so while representing Mr. Reichberg, consistent with her ethical obligations, she can move to withdraw, and I will figure out what to do in response.

I might, for example, defer the trial or sever it from that of Mr. Grant so that new counsel could get up to speed.  If the tactical decision is, however, for counsel not to testify, then there is no issue.  I do not understand, I will say as an aside, that her testimony is necessary; that there are others who could provide pertinent preparation, including Mr. Reichberg's brother and, of course, the defendant himself.

Alternatively, as I understand it, Ms. Necheles could also conclude that the "substantial hardship" exception to the

rule applies and continue to represent Mr. Reichberg here while still providing testimony and subjecting herself to cross-examination and potentially opening the door to an examination of what I understand to be attorney-client communications.

All of those decisions are either tactical decisions by Mr. Reichberg or decisions by Ms. Necheles and her firm regarding her compliance with her own ethical duties. I accept that these may be, and are, difficult decisions, but that the defendant faces hard choices does not lead me to believe that the relevant evidence should be excluded with respect to the preexisting charge. Nor do I believe that they are an adequate or inadequate to sever Count Seven from the remainder of the charge in this case to give Mr. Reichberg more time to consider the best approach.

First, as I said, I do not believe that this issue is limited to Count Seven. Any testimony that Ms. Necheles would provide would also be pertinent to the other charges to which this evidence relates. As a result, I perceive this in part as a tactical request as well as a substantive one.

Second, I accept the government's premise that a severed trial regarding the obstruction of justice charge would not be as short and simple as defendant posits. The government would have the opportunity to introduce evidence to show what the nature of the crimes were that the defendant was attempting

to obstruct.  As a result, this subsequent potential trial on Count Seven would involve a substantial number of witnesses, a substantial amount of court time, and, therefore, would be a significant investment of time and a joint trial would accordingly represent a significant savings of time and efficiently for the Court, the parties, and our potential jurors.

As the government rightly notes, a discretionary severance under Rule 14 should be granted "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants or prevent the jury from making reliable judgment about guilt or innocence."  *Zafiro v. United States*, 506 U.S. 534, 539 (1993).  I do not believe this issue to raise such a kind of serious risk that the Court addressed.

So, Mr. Reichberg should make the relevant tactical decisions and should make them promptly.  Counsel will let me know if counsel needs to withdraw because of this issue and wishes to move to withdraw.  If so, I will respond to the request.  Alternatively, I will be advised that the substantial hardship exception applies.  Unfortunately, I do not believe that the desire to escape these difficult choices alone justifies severance of Count Seven, given the costs that a separate trial on that count alone would impose on the Court, the witnesses, and the parties.  So the request with respect to

the severance of Count Seven is denied.

That takes me to Mr. Reichberg's motion to dismiss Count Three and Six, about which I'm also prepared to rule.

Is there any argument that either party would like to offer to that issue?

Counsel for defendant.

MS. NECHELES:  No, your Honor.

THE COURT:  Thank you.

Counsel for United States?

MR. BELL:  No, your Honor.

THE COURT:  Thank you.

Let me take up those issues now.

First, let me say I appreciate the issues raised by Mr. Reichberg in his April 13, 2018 motion to dismiss the indictment.  He argues that two of the charges in the superseding indictment are duplicitous; that the argument is premised on Mr. Reichberg's assertion that each of those counts charge the defendant with participating in several separate conspiracies.

Mr. Reichberg claims that the conspiracy charges a hub-and-spoke conspiracy, but that there is no rim connecting the spokes and -- such that it charges multiple separate conspiracies in the same indictment.  For a description, a very good description of the varieties of single conspiracies and hub-and-spoke conspiracies in particular, I refer you generally

to Judge Forrest's decision in *United States v. Ulbricht*, 31 F.Supp.3d, 540, 552-54 (S.D.N.Y. 2014).  I do not believe that I can conclude at this time that the counts are duplicitous.

"An indictment is impermissibly duplicitous where:

(1) It combines two or more distinct crimes into one count in contravention of the Federal Rule of Criminal Procedure 8(a)'s requirement that there be "a separate count for each offense;" and (2) the defendant is prejudiced thereby..."

The relevant policy considerations guiding a Court's determination of whether a defendant was actually prejudiced by a duplicitous indictment include:  Avoiding the uncertainty of whether a general verdict of guilty conceals a finding of guilty as to one crime and finding of not guilty as to another, avoiding the risk that the jurors may not have been unanimous as to any one of the crimes charged, assuring the defendant adequate notice, providing the basis for appropriate sentencing, and protecting against double jeopardy and subsequent prosecution." *United States v. Sturdivant*, 244 F.3d 71, 75-76 (2d Cir. 2001).

As the defendants concede "The question of whether the government has properly alleged a single conspiracy or improperly alleged multiple conspiracies is normally a question (at least initially) for the jury." Defendant's motion ECF 195-6.  This case does not fall outside of that general rule.

I4NQGRAc1

The defendant asserts that it does because the "government has not claimed it can show a single-rimmed conspiracy." *Id.* but the government does claim just that as set forth in its responsive letter ECF 206.  The government asserts that the elements of a rimmed hub-and-spoke conspiracy can be established with its proof, and I cannot deny the government the opportunity to prove its case.

I appreciate the concerns articulated by the defendant.  However, I expect that we will have the opportunity to discuss at our charging conference whether a multiple conspiracies instruction is warranted in this case.  From the information that has been proffered to the Court to date, it appears that one may be appropriate.

I'm also going to talk about the issues raised in the parties' renewed motions for a bill of particulars where the defendants request that the Court order that the defendants be provided with a bill of particulars describing the alleged co-conspirators.  I'm going to take up that issue momentarily, and we will discuss that there.

I will simply say that if I grant that application, it will help to alleviate any potential prejudice to defendants with respect to those issues.  With respect to the defendant's motion to dismiss Count Six on the basis of the alleged vagueness of the term "misapply," the motion must be dismissed. The Second Circuit specifically rejected a vagueness challenge

to that term in *United States v. Urlacher*, 979 F.2d, 935 (2d. Cir. 1992)  It is the controlling precedent binding on me.  If the Second Circuit wants to change its position in light of recent Supreme Court precedent, it can do so, but I cannot.  To the extent that the argument is that this statutory term as applied here is too vague, the argument is raised prematurely and will have the opportunity to evaluate the language at the appropriate charge after the case has been presented.  So the motion to dismiss those counts is denied.

Let's talk about the expected length of trial later. I think maybe we should take this up after we talk about the defendant's most recent letter which raises concerns regarding the government's timing of production of information.

Is there anything that is raised by this issue other than the suggestion that the trial will last five weeks?

MS. NECHELES:  Yes, your Honor.  It's an enormous due process issue.  In the last month -- well, since January, your Honor, I think we attached to our submission last night, we have received 12 new productions of discovery, including one that came last night that we did not attach.  In the last week we've received documents executing three search warrants.  Last night we received a new search warrant.  We don't have time to review all of this.  It's impossible.  Among the things that have been produced to us in the last month, two months are things that have been in the government's possession for two or

I4NQGRAc1

three years.  These are things that the government intends to introduce into evidence.

For example, there are photographs and videos of the defendant with police officers.  It goes to the heart of the criminal activity here charged.  The government has had this evidence in its possession, I learned recently, since before the Huberfeld trial, the Seabrook trial, which took place in October of 2017.  I don't know when it first got in the government's possession.  I know it was in their possession and it was just produced to us in I believe March.  This is all stuff that we can't search.  We have to watch every one of them or look at these pictures and figure out who is who on the pictures or discuss it with our clients.  I don't know who these people are.

There are entire email accounts that are just now being produced to us including New York Police Department email accounts which we specifically discussed with the government about a year ago, and they told us they are not relevant and are just now being produced to us.  There are the Westchester County documents -- and part of what the government keeps saying -- there is really two categories of stuff.  One is a category of stuff that's been in their possession all along, including in the police department's possession and is now being dumped on us.

The second category is stuff -- and that includes, for

example, motion in time.  There's allegations that there was a watch.  There is other act evidence with respect to Mr. Astorino.  There's allegations that he was bought a watch. That apparently was in the government's possession since before this case was brought, those documents, or in the beginning of when this case was brought.

In addition, there are documents such as the Westchester County documents.  The documents themself indicate that these materials have been in the government's possession since April 2016.  Just turned over to us in the last month. At best, the government has been unbelievably sloppy again, and this sloppiness is killing us, Judge.  It's killing us.  It's depriving these defendants of a right to a fair trial or to effective assistance of counsel.  It is impossible for us to review all of this material now.  That is one category of stuff that was in their possession.  That includes all the police department materials, which is just now being dumped on us. This is a joint investigation.  Every affidavit from FBI Agent Downs says this is a joint information.  The first people who went out and interviewed people were IAB officers.  All of this was in the government's possession, and they are just turning it over to us now.

In addition, the government has decided not to do work on this case until the last two months.  So what they keep telling your Honor is that it is a continuing investigation,

but the things they are investigating are stuff that they alleged in the indictment.  So, when they go out now and start pulling things, for example, about the Lincoln Tunnel, these are things that have been at issue from way back.

Another example, your Honor:  The tapes.  We have received in the last and half, 104 transcripts, 104 transcripts.  Let me tell you the dates.  I'm sorry, 134 transcripts.  On March 26, we received 30 transcripts.  On April 9, 74.  Last night 30 new transcripts.  Before that, we received zero.  Zero transcripts.  We kept raising this with the government and with the Court saying, "When are we going to get these transcripts?"  Because at this point it is impossible for us to review them for accuracy.  Impossible for us to review them.

But beyond that, for every transcript, now the government is saying, "OK, here are the transcripts.  Here are the tapes."  Out of months of tapes, hundreds of thousands of calls, "Here are the ones we think are important."  So now we have to go back and put those in context.  Review what are they putting in and what other ones are relevant on that topic and then be producing to the government.

I will not stipulate in this case to any transcripts, the accuracy of any transcript because I can't.  I cannot possible do that.  I cannot possibly have someone review these for accuracy.  I have said it before, I said it to the

government a year ago.  It takes a lot of time to stipulate.  I said, if you do this to me, I will not be able to stipulate to it.  And now I can't stipulate to it, which will be, I will stipulate I guess that they produced these or that they created them, but I will not stipulate to their accuracy.  And what they have produced has been extraordinarily inaccurate.  They are first draft of transcripts.  The government has said they are just creating these transcripts now.

Again, it's sloppiness.  It is an unwillingness to do the work at the time that it should have been done, and by doing this, they are depriving these men of their due process rights.  We as a defense attorney, as a defendant, you are reacting to what the government is putting into evidence.  We have no burden.  We are reacting to what the government puts into evidence.  When they give us everything especially in an electronic case with the massive amount of discovery that is here, when they give it all to us so late, they are making it so impossible for us to prepare a defense.

Your Honor, at this point -- and we lay out the incredible amount of things that they have been producing in the last month and a half, two months.  And things have not been produced.  For example, we just learned two weeks ago that the complaining witness has a Dropbox account.  This is a person who testified at last trial that he destroyed his -- you know, destroyed his email, destroyed his evidence, destroyed

his computers.  Now apparently he has a Dropbox account.  So now we have to subpoena the Dropbox account.

THE COURT:  I'm sorry.  Can you describe this evidence again, Counsel?

MS. NECHELES:  Your Honor, actually, I just learned about it last week.  All of a sudden the government was producing to us videos and photographs from Jona Rechnitz.  So I asked the government, where does this come from?  And where is the electronic format of that, which we still have not received to date.  Where does that evidence come from?  I was told by the government that it came from a Dropbox account for Mr. Rechnitz.  I asked the government for the whole Dropbox account, because given that he destroyed the computers and his phones, and testified he wipes them clean and deleted materials after he learned that there was an investigation, given all that I want to see what he put off to the side, what he secreted, what kind of thing there are.

The government informed me it is not in their possession.  They have not asked Mr. Rechnitz for it.  So we will have to subpoena it.  To date I do not have the electronic data for those videos to see when it was produced.  I do not have the electronic data for the Dropbox account.  It is shocking to me that the government did not get this whole account into their possession and are allowing their informant to pick and choose what he would be producing to the

government.  But that is apparently what's going on.  I am only learning of this at this stage, two weeks before trial, which seems like, again, another example of the defendant's due process rights being deprived.

Your Honor, I don't want an adjournment of the trial. I have said this all along.  A year ago Mr. Bell stood up and asked your Honor to schedule a quick trial and said, "If we haven't produced it, we'll be happy anything we haven't produced to be Rule 16 material to be excluded from evidence, your Honor.  That's what I'm asking for at this stage because this seems designed to prevent the defendants from obtaining a fair trial.

It is impossible for us to review the volume of materials that they gave us.  And there is no reason this should have happened in this case because there is nothing that the government is producing that they can stand up here and say, well, we didn't know that we had to investigate that area. Two years ago they knew all of this, and they just didn't do their work.  So they're leaving it for us just to be killed.

Your Honor, it goes back to what happened with the production of Mr. Reichberg's electronic devices to everybody. It is sloppiness and it is sloppiness that is depriving my client of his due process rights.  We ask again, and based on that, I think your Honor has now seen a pattern of behavior that I think should cause your Honor to reconsider your earlier

decision not to suppress all the evidence, and I ask again that it be suppressed and that anything that is being produced at this late, late date be excluded from evidence here.

THE COURT:  Thank you.

Counsel for the United States, let me hear from you, please.  The defense has pointed to a significant amount of evidence that is being produced in these last weeks before trial in their April 22 letter.  Can you give me some context at the outset?  Why the delay?  This is not customary in my limited experience from the government.  What is happening here?

MR. BELL:  It may be helpful to touch on, your Honor, by way of example a couple of these.  Some of these are interesting, I suppose, to hear now because these are issues that already have been litigating that are selectively being revived and repackaged for a second bid for suppression.

I'll mention the Dropbox issue, which I maintain is actually a non-issue.  We have produced certain images that we've received from Jona Rechnitz who is going to be a witness at this trial.  Those images, which, I suppose it took me in the original instance a couple of hours to review.  These are pictures and relatively short video clips.

They are images that Mr. Rechnitz sent us as we asked him over the course of our preparation with him, as he gave us more information to furnish to us.  These are images, for

example, that are a picture of defendant Grant and defendant Reichberg together at a celebration at a Purim, a Jewish holiday at Mr. Reichberg's home, that sort of thing.  Videos of Mr. Rechnitz and others involved in the case being escorted through New York City traffic with lights and sirens.

These are images that we have disclosed as soon as we've gotten them.  They are images that we made available to the defense as soon as it made sense.

The defendant came back relatively recently, within the past two weeks and made two points.  The first of these is that where we produced these things, consistent with the rest of our packaging of this evidence, Bates numbering them, getting them in a format that is digestible by most conventional applications.  We've put them out there in PDF form.  That has been true for a lot of different types of documents.  That was true with the images as well.  The defense relatively recently -- I should clarify because actually Mr. Meringolo has had a different, and somewhat more muted approach here -- Ms. Necheles has asked on behalf of defendant Reichberg for certain of those pictures or all of those pictures be produced in native form.

Contrary to what Ms. Necheles just told you, we've done that.  Those images have been made available to her through the protocol that we use to send devices over.  So I'm not exactly sure what it is that she is asking for now.

THE COURT:  The question is:  When was that done?

MR. BELL:  I believe -- they had already had the images as far back as March 17.  We gave them the native formats on April 18.  I think that's three days after they asked for it.

We also answered a question that Ms. Necheles had given us, which is where did these images come from?  What device did they come from?  What computer that they come from?  I don't know that that is something that would make its way into trial, but we were happy to help.  So we endeavored to get a sense from Mr. Rechnitz where the devices had been stored and to what degree he knew where the individual pictures had emanated from.

What Mr. Rechnitz informed us of and what we told Ms. Necheles was that Mr. Rechnitz an electronic account on Dropbox.com where, like a lot of citizens, he saves pictures that matter to him:  Pictures he's taken himself, pictures that other people have sent to him.  So where he got these things is from the Dropbox account that he owns.  That's not unusual.  When you save things on a Dropbox account or similarly based cloud-like space, the same way that you might on your computer or one of the photo sharing websites or something like that.

Ms. Necheles then asked whether she could get access to the entirety of the Dropbox account, a request that I don't think has an actual basis.  These are pictures.  She asked for

them in native form.  I'm not sure what else there is to be said about a picture that features Mr. Rechnitz and a couple police officers at a party.

THE COURT:  I think her concern is more substantial than that.  I think that her concern is that the government has essentially allowed the cooperator to decide what evidence to produce to the defendant by leaving the documents in the cooperator's possession rather than collecting them itself, and therefore, taking on the obligation to produce them to defendant.

As I understand her comment related to the prospect of subpoenaing Mr. Rechnitz, the defense is concerned that there may be other records in Mr. Rechnitz's Dropbox that are pertinent to the preparation of their defense, and they were unaware of the existence of this category of documents until these paragraphs were raised.

So as I understand the concern, it was broader than just the electronic data associated with the original files here.

MS. NECHELES:  Your Honor, if I could just add a little bit also?

THE COURT:  Please.

MS. NECHELES:  The government has had these since at least October of last year because I recently learned they were produced to the defendants in the Huberfeld trial, the Seabrook

trial.  So when they say "we got them awhile," we only got them the government said in March, a month ago.  They had it all this time.  They didn't give it to us.  When they gave it, we asked for metadata.  I gather they'd given some metadata.  The video still has no metadata.  Some of the photos have metadata.  But the metadata I believe that they produced shows October 2017; in other words, when it was produced to defendants in Huberfeld case, and it doesn't have the metadata having to do when was it put on to Dropbox.  In other words, when Mr. Rechnitz destroyed his computers and wipes them clean, did he selectively take things off of the computers and put them on Dropbox?  That's pretty important facts.  I would have thought the government wanted to know that.  Apparently, they have not asked for it, looked for it.

Your Honor, this is particularly disturbing because I can't get a search warrant.  So we're talking about a person who has admitted massive destruction of evidence and massive amounts of obstruction of justice, trying to tamper with witness, causing people to lie, and there will be all that testimony at trial.  He testified about it before, and he testify about it again at trial.  And all of that, and the government never even got a search warrant for this Dropbox.  I don't know why, but by giving us this stuff so late in the game they are deriving us of the ability to get this information ourselves.

THE COURT:  Thank you.  Understood.

Counsel for the United States, the defense has suggested that the appropriate remedy as a result of the government's late disclosure of this information is that I should prevent the government from using this late disclosed information at trial.

What's the government's position?  Are you prepared to respond now?

MS. RAVENER:  One moment, your Honor.

THE COURT:  Thank you.  Please take your time.

(Pause)

MS. RAVENER:  Your Honor, yes, if we may address that. To be clear, we have been producing the vast majority of these materials as we receive them.  The materials Ms. Necheles is referring to now were initially produced to her over six weeks ago.  I'm focusing now just on the Jona Rechnitz videos photographs, your Honor.

The cooperating witness and all of his various resources are not a member of the case team.  We are not required to search every file or search his home.  In the course of interviewing him, to the extent we've identified other material that's out there, we've obtained it, and we're happy to continue to work with defense counsel to pursue anything else that they request within reason.

But to your Honor's question, the proper remedy here

I4NQGRAc1

is not the preclusion of evidence that has value to the truth-seeking mission of the trial and value to the jury. As I said, this is material that they have largely had for approximately six weeks in advance of trial. That's more than enough time to look at pictures and videos that are consistent with allegations we've already made in this case.

The case law is clear, your Honor, that absent bad faith on behalf of the government, which there is no record of bad faith here, the proper remedy, if any, to the extent a disclosure is deemed belated, is a continuance. It is not the preclusion of evidence. Preclusion of evidence is a drastic remedy that is contrary to the mission that's before the Court and the mission that the jury is going to be asked to resolve.

I'm happy to go through the various categories, your Honor, to address where we stand, but the vast majority of the things they're talking about are materials that were not in the government's possession last year. That is a mischaracterization. I'm happy to address it in turn, but in general, we don't believe any of these issues warrant preclusion of evidence at this time given the timing of disclosures, the timing of trial and the nature of the evidence.

THE COURT: Thank you.

Any rebuttal argument from either defendant?

MS. NECHELES: If I just -- I think we set out the

dates.  Some of it was -- the photographs were produced on March 17, some produced on April 13, some were produced on April 18.  In addition -- that's just one little bit of all of the massive amount of information we've gotten.  Everything set forth in our letter here on pages 2, 3 and 4 are stuff we just got, much of it which was in the government's possession for a long time.  In addition, some of the stuff in these videos, there were escorts.  Mr. Rechnitz is having an escort with some police.  I don't know when it is.

It's stuff that should be being addressed by the Court.  There's issues as to admissibility of this stuff.  I don't know who's giving the escort?  Is this a bribe?  Is this coming in as bribe evidence?  Or just as background?  What is the jury going to be instructed?  So it's very troubling that we would be getting this essential material that they had in their possession since before October at this last minute. Again, it goes to the issue why do we need the bill of particulars?  How the jury will be able to follow all of this? It's all very troubling, your Honor.

THE COURT:  Thank you.  Understood.

So I, too, have wished a greater degree of diligence earlier with respect to the production of records by the government, with respect to the suppression of materials as you will hear in my more lengthy decision with respect to that issue, more attention to the substantial issues raised by

I4NQGRAc1

Mr. Reichberg with respect to that issue.

I don't think the exclusion of all of these documents categorically is the appropriate remedy.  Ms. Ravener is I think correct in her argument that that would be contrary to the truth-seeking mission of the trial.  There is no indication of government bad faith in terms of the timing of the production of these records as opposed to something else.

I am happy to entertain a continuance of whatever duration the defendants would like to propose in order to prepare to meet this evidence.  I think a continuance is a perfectly appropriate remedy to the extent that the defendants are not prepared to meet this evidence at trial on the date that's scheduled, I believe that I would happily entertain a request for a continuance to permit that.  As I understand it, at this point the defense has had much of this information since March, so that is some number of weeks, if not a month less, to review the materials.

MS. NECHELES:  But, your Honor --

THE COURT:  Give me one moment.  We still have some time between now and the date of trial, which is, as counsel points out, is two weeks from now.  If counsel for defendant, either of the defendants, believes that that amount of time is inadequate to allow them to properly prepare to meet this evidence, please make a request for a continuance, and I will consider it, and we will move forward with that.

I4NQGRAc1

MS. NECHELES:  Your Honor, I think we're going to need to discuss with each other.  To be clear, we have received six new discovery productions since April 1.  So -- I'm sorry, from March 28 to date.  So it is not correct that we've had all of this from March.  And I will say in addition, all of this discovery could be uploaded and to figure out how to get access to it, so we cannot review it all at this point.  There are issues with new searches and warrants that were just turned over to us last night, so there may be further motion practice on search warrants.  I don't know why the government waited so long.

THE COURT:  I'm sorry.  Please say that again, Ms. Necheles.

MS. NECHELES:  Yes.  In a letter we received last night from the government, it contains -- we are informed that they will be turning over to us a search warrant for a new email account which is an email account belonging to Mr. Reichberg is my understanding.

MS. RAVENER:  Your Honor, if I may correct the record?

THE COURT:  Thank you.

MS. RAVENER:  The search warrant relates to two email accounts that the government obtained a warrant for some weeks ago.  We only received the response for one of those accounts from the service provider this week.  As soon as it could be processed, we produced it to the defendants.  The other one has

not even been received by the government, so we can't produce it. We have nonetheless turned over the warrant affidavit and both warrants used to obtain those email accounts to defense counsel on Saturday, so they have that.

They received the warrants as soon as we actually could be advised by the providers that they were producing the accounts imminently or, in this case, produced one of the accounts, at least to us, so there wouldn't be a chance of tampering the accounts by disclosing the existence of the warrant. I don't know yet whether the government will seek to introduce any evidence from that account in our case because we have turned it over as soon as we received it to the defense without our review. Let me be clear. We turned it over only to defendant Reichberg. Reichberg received his account. Mr. Grant has not received that production.

THE COURT: Give me one moment to get some more details. I'd like to ask a couple more questions of the United States.

Are this these email accounts other than the Reichberg and JRG account that were at issue previously?

MS. RAVENER: Yes, your Honor, they're different accounts.

THE COURT: Thank you.

Can you tell me again more precisely when it is the government obtained that search warrant?

MR. BELL:  Your Honor, I believe we obtained that search warrant in early March based on information -- that's right, late February, but approximately two months ago, in any event, based on information that we learned through the investigation.  It bears noting, your Honor, that those email accounts, certainly one of them, pertains not only to the possibility of evidence relevant to the crimes charged here, but also to the possibility of wholly separate crimes potentially committed by Mr. Reichberg for which he remains under investigation.

THE COURT:  Thank you.

MS. NECHELES:  I would note that it is our belief that they learned about this search warrant because we see it in -- or I mean this account based on devices that the government didn't bother to search, as your Honor is already aware, didn't bother to search until this year.  We see it in those references.  We see it in emails in those other accounts that were Mr. Reichberg's.

So while the government may say that they only learned about it now, it's because they only are doing their work now. And there are 13,000 new emails in this account, which we just got the search warrant for two days ago.  We can't even move, make a motion yet on this search warrant because the government hasn't done the search on it yet.  So it continues.

I understand the government says it's an ongoing

investigation. But that is really not an answer. At this point, your Honor, I do believe that it is misconduct by the government. It is misconduct when you wait so long and deliberately in a way that you know is going to cause this kind chaos in a case, a case that has been pending two years, and where you are causing these defendants to choose between going ahead and waiving their speedy trial rights or being able to have their due process rights to have a complete defense, and where these men have run out of money for attorneys. They cannot keep paying for it. And the reason they are being put in this position is just because of delay and a failure to do the work by the government.

MR. BELL: So, respectfully, Ms. Necheles is once again incorrect. It is true that we were aware of the existence of this email account from our diligent and ongoing review of earlier evidence. That is not the same as appreciating right away that for reasons we learned about relatively recently those email accounts may contain evidence of crime and, indeed, evidence of some wholly separate crimes.

Ms. Necheles I think wants very badly to be able to speak authoritatively about the contours of our investigation and when we learned that stuff. Respectfully, she's not on the investigation team and her assertions do not make it so.

I would be happy, although I doubt very much that it's necessary, your Honor, to make some sort of representation in

camera as to what influence the precise timing with respect to that email address. But the reality is that Ms. Necheles is once again attempting to mush, for lack of a more scientific term, virtually every development that happens in this case into some protestable course of misconduct that simply does not exist here. There is no authority, your Honor, that says we couldn't have gotten that search warrant when we learned of the information that we did, and we have.

We are willing to go ahead at trial without what we may get from the one email account that we received if we're not able to conclude the review. We're willing to go to trial if the other email account does not come back to us promptly, although it probably should have by now, but that's on the provider. But the issue here that this represents any sort of misconduct on its own, let alone some sort of continuing misconduct, that's just not true, Judge. And I think to actually unpack and treat on an individual and careful and thoughtful bases the various and sundry allegations of misconduct that Ms. Necheles continue to shove into this rubric that don't make sense is to recognize that there isn't anything truly unusual happening here.

At the same time, I think that there also has been in the course of an assessment of what we've done here, the reality of the sprawling nature of the case itself, of the conduct itself has left something of an imprint on the

discovery patterns here.  That is true.  I think on some level it's not ideal, and in some individual instances, largely that we've already litigated, it's been somewhat lamentable.  But at the same time, the very nature of the charges here charge a relationship that took place over a lengthy period of time that involved a lot of conduct.

And, by the way, as Ms. Necheles has asked for additional discovery on certain issues, we've gone ahead and produced that, and of course it's those very same tranches of discovery that Ms. Necheles now comes back and says are now causing delays that are going to make it very difficult for her to do much of anything.  So we're sort of in a darned if you do, darned if you don't posture that I think Ms. Necheles has managed, at least rhetorically to exploit very well.

If counsel for defendant Reichberg or defendant Grant seeks some sort of continuance to deal with the total weight of what's gone on, whether it is things that like some of the NYPD documents, for example, have been produced on a schedule previously set by the Court, that's not a surprise coming in today by anybody or for whatever other reason, then they should ask for that continuance and they should do so today.

Otherwise, your Honor, and we can go into categories of discovery and complaint, but I'm not sure it is actually necessary, we are ready to go on May 7 and will continue to investigate this thing until May 7.  To the extent that

additional evidence comes up, we will disclose it promptly in keeping with our investigations as we've done throughout this thing. One moment, please.

THE COURT: Thank you.

MS. NECHELES: Your Honor, can I just make one other comment with respect.

THE COURT: Give Mr. Bell a moment. You're not completed right, Mr. Bell?

MR. BELL: I don't think we have anything else to add to that, your Honor.

THE COURT: Thank you. Please proceed, Ms. Necheles.

MS. NECHELES: I have to speak with Mr. Meringolo about whether we need more time, whether the defendants are willing to waive their speedy trial rights because of this enormous production of documents, but, your Honor, I think there is another thing that is going to come into play here. Given the number of tapes the government has identified and the 50 witnesses and the 1400 exhibits that they say they're putting in, conservatively, this is a six-week trial. I believe it will be longer.

We have many tapes that we will also be playing in response. We have witnesses we will be calling. Given the sort of sprawling nature of what is being put in here and all of the sort of other act evidence -- and, Judge, the other act evidence is massive. All of the stuff about DiBlasio and the

I4NQGRAc1

political contributions, we will be disproving.  We will be showing they are not criminal acts and because -- it's not the charges here, but because it's coming in, we have to disprove it.  So there's about five or six substantive things that could be a trial in themselves that we will be putting in evidence to show is not true.  So I expect the main witness will be on the stand for about two weeks.  And given all of that, I believe that it's at least a six-week trial.

So I know that your Honor has constraints on your schedule.  And this all sort of plays into whether we need more time.  Do I believe, yes, would I like another two weeks perhaps?  Yes, I would like another two weeks, but do I want to put this case over until October or so, which is what would happen with your Honor, given your schedule that you've mentioned.  I don't want that to happen.  I don't think the defendant can afford that.

THE COURT:  Thank you.  I can reassure on that point to some extent.  I can tell you the trial that I had scheduled that was going to start right after this has been adjourned.  So my scheduling concern right at the back end of this trial has been alleviated since the last time we discussed this issue.  So I have time both at the back end in the event this goes longer than we discussed in our prior conference, and I think that would also potentially permit a shorter continuance to allow the defense to prepare to meet this evidence while

I4NQGRAc1

still allowing a six-week slot of time for trial before I hit my next scheduled trial, which is in the beginning of July.

MR. BELL:  I will note, your Honor, very quickly with respect to Mr. Rechnitz in particular, for what it's worth, and the directs usually do have something to say about this just owing to scope, assuming that all goes well, we do not anticipate having Mr. Rechnitz on the stand for more than two trial days and potentially a fair amount less than that.  So, again, I think it's relatively easy to sit in the back table and to draw out of these sort of epic-in-scope estimates for how long things are going to take.  We have reassured your Honor in a number of filings at this point that it's not our intention to dwell or prove up to an outlandish degree all of these other acts that aren't what's actually being charged there.  They will be mentioned -- partially because they're background and they have to be, partially because they're Giglio, and they have to be -- but they are not going to be the focal point.  We are going to be disciplined about these things.  And I offer that relatively concrete estimate with that in mind.

MS. NECHELES:  Your Honor, we need to disprove them. You know, when the government comes in and they will have Rechnitz, and I reviewed his testimony the other day in this other trial and 3500 material, he comes in and says, well, you know, I had a cousin Ruthie, who we fixed -- Mr. Reichberg went

in and fixed him through political bribes, got her a permit. Well then we have to show, no, that's not true because the government is putting this in and will sum up and say, "You see how Mr. Reichberg acts. That's how he operates in everything." And disproving it takes a lot longer than Mr. Reichberg saying in a throw-away statement, "Oh, that was a bribe. No, I understood that was a bribe." But to disprove it, and we will disprove all of these. It will take quite a bit longer. We will have to bring in other evidence, documents, maybe other witnesses. It's massive what the government is intending to put in, all of the other things that they fold into the political bribery. It's about five or six incidents that they claim. These are the gifts. These are the official acts that we got. So we need to show, no, that's not true at all. Those were not official acts and those were not gotten through any sort of bribery.

So this is a case where it's almost like the other act evidence and the background evidence is going to eat up the case so massive that I know as we continue to say there is a great potential for confusion and overwhelming the whole case here.

THE COURT: Thank you. Understood.

Let me leave it at this with respect to yesterday's letter related to the government's relatively recent production of documents to the defense. I don't believe preclusion is the

correct remedy.  I would be happy to entertain a request for a continuance to allow the defendants to address this evidence. I think that the defendants are in the best position to determine am how much time that they need in order to properly evaluate and consider this evidence in connection with their defense.  I'd be happy to entertain a continuance of any duration, whether that be for months or a week or so.

What's important for me is to hear from the defense regarding how much time you think that you want to have in order to meet this new evidence.  If you want me to give you four months to do it and schedule this to take place in August or October, I'd be happy to entertain that request.  Just let me know what you think is appropriate in order to protect your client's interests.

Counsel for defendants, are you prepared to tell me what you think about that now?

MS. NECHELES:  If we could have a short adjournment to break to be able to discuss that.  In addition, your Honor, because this will be relevant on the issue, is your Honor intending to order a bill of particulars here?

THE COURT:  Thank you.

I am prepared to rule on that issue, and I was going to invite further arguments with regard to that issue before I did so, I would be happy to take that up now, unless there is something else that the parties want to address.  I think it

I4NQGRAc1

make sense for us to take a short recess to allow you to confer on that issue.

We could also talk about anything else before we take our short recess.  I do want to talk about the voir dire comments.  What's the parties' preference?  Would you like to take a break now for you to have that discussion?  Would you like to talk about something else before I come to the bill of particulars?  I'm happy to accept whatever proposal the parties would like to make.

MS. NECHELES:  I thought it might be helpful for our discussion of the length of adjournment to know whether your Honor was going to give a bill of particulars.

THE COURT:  Good.  Thank you.

Is there any additional argument that any party would like to raise with respect to that motion.

Counsel for Mr. Reichberg.

MS. NECHELES:  No, your Honor.

THE COURT:  Thank you.

Counsel for Mr. Grant.

MS. CAPPELLINO:  No, your Honor.

THE COURT:  Thank you.

Counsel for United States.

MR. BELL:  Only to note, your Honor, as we did in our submission on this point, that we have outlines now -- well, we've outlined sort of a list of officers involved.  We've

I4NQGRAc1

outlined to a greater degree than is legally required than the superseding indictment even did, the officers involved and to some degree the nature of each of their respective involvement.

With respect to what I'd say are the two most prominent officers involved in the schemes charged -- Defendant Grant and former defendant Harrington -- we are here, in particular, and this is where the government's focus would be in any event, of course the defendants have long been on notice of the principal items in the quid and quo lists that make up what they received and what it is that they got.

They have been set out -- as your Honor knows from your Honor's prior and I think entirely appropriate ruling, those have been set out at length in the complaint, in the original indictment, in the superseding indictment, and they have been refined over the course of that regression to make clear in addition to that supplementary letter what it is that we intend to do and what it is that we don't

THE COURT:  Can I ask about that?

MR. BELL:  Sure thing, your Honor.

THE COURT:  With respect to the quids and quos, the superseding indictment with respect to Count Three, now includes that language that Ms. Necheles pointed to in her letter prior to our April 5 conference that describes prescribes from -- alleged bribes from Mr. Reichberg to other law officers, people other than Mr. Harrington and Mr. Grant.

I4NQGRAc1

So when I ruled on this issue previously I understood the focus of the case was on things given to those two particular individuals. The defendant's argument now is that the cases open up to bribes to any number of other people not represented as defendants here. What's your view of that addition to the need for a bill of particulars regarding alleged quids and quos by those people who aren't present here.

MR. BELL: Your Honor -- one moment, please.

THE COURT: Thank you.

(Pause)

MR. BELL: Your Honor the quids and quos that the government seeks to present and that should ultimately be presented to the jury in making their determination, they would only pertain to an identified number, and we're talking about on the order of six or seven co-conspirators. These are people who we have voluntarily identified in a prior correspondence. You will recall that in the correspondence that I make reference to now, we made reference to chief one, detective one, officers one through six or seven. We had done that chiefly in the interest of illustrating the degree to which this is all part and parcel of the same thing because many of those people were co-recipients of these quids, for example. The flight to Las Vegas, which defendant Grant was a passenger was one in which Detective One traveled as well.

So, look, again, the investigation is ongoing, but we

I4NQGRAc1

do not intend for that nucleus of officers to spiral outward. To the extent to which there is a sort of iterative evolution, we will happily notify defense counsel, and to the extent that it's helpful and necessary, the Court in the same way that we did in the correspondence where we identified, Officer One, Chief One and so on and so on.

THE COURT:  Can I ask on this?

MR. BELL:  Sure.

THE COURT:  The defense raises, I'll call it, substantial concerns regarding whether the indictment raises or is charging more than one conspiracy.  I've concluded that the indictment is not duplicitous, but that raises the issue when we get to charging the jury of whether or not the conspiracies are a single conspiracy or if there are multiple conspiracies.

I will say that in evaluating this request for a bill of particulars, I can see some benefit to requiring the government to identify with more specificity who the co-conspirators are in the charged conspiracy so that I and the jury can evaluate whether or not the evidence supports the conclusion that the charged conspiracy occurred as opposed to some other conspiracy that is not linked.  That is one of the concerns raised by the defense in their motion on duplicity.  I denied that motion, but it has some resonance with respect to my assessment of the bill of particulars issue as well.

Can you address that concern?

MR. BELL:  I can, your Honor.  I think it is with that category of concerns in mind that we put together the submissions that I referenced before.  I don't know whether your Honor has it before you, but the submission in which --

THE COURT:  I do not.

MR. BELL:  OK.  The submission in which we, again, offered that enumerated list of co-conspirators and what it is quid and quo-wise that pertained to each of those.  In an sense, your Honor, I'm suggesting that that representation to the defense and to the Court essentially moots some of the concerns that you're talking about because we have made those clear.

We've given the full roster of co-conspirators.  We've given a sense of what it is that we understand they received and what they got back.  We can do that with the greatest detail possible, although I think that we've already done it to a greater degree than would be required, frankly, for Grant or Harrington if they were the sole people charged in the superseding indictment.

That is something I think, your Honor, again gives the defense sufficient notice of the people involved, and as to the shape of the conspiracy itself also provides facts that would enable a jury to find what is actually necessary here, which is that there is some commonality of interest, some loose awareness that there are some other "spokes" involved than

themselves and from which they can reach what's required here.

Of course, there are limits as to what the government has to actually prove in this respect.  Not all of the conspirators had to know each other.  Not all of the conspirators had to know the ins and outs of each other's roles.  But we have made a representation that I think surpasses what is actually required.  As I am representing here and will represent again to your Honor we will continue to do that between now and trial, whenever trial may be.  We appreciate your Honor's concern.  We think the specific correspondence that I reference here has mooted a lot of that, but we will continue to update things.

THE COURT:  Thank you.  Good.

Any other argument with respect to this set of applications?  Defendant.

MS. NECHELES:  Your Honor, I would just say the other reason a bill of particulars is really needed here, I think that as the trial starts and progresses, because there's so much stuff out there for other act evidence, we all need to have in front of us a clear sense of what's the charges here and what's other act evidence.  All the sort of escort, where they can't link it, who gave that escort, was there any bets.  There are things that may have been done improperly which are not a bribe and which can't be the basis for our Count One, for example.

So without clarity here, I don't know how your Honor will rule on motions, you know motions to preclude evidence as it goes along and as things happen quickly.

I understand when Mr. Bell stands up and says "we'll give it to them," I understand he means well, but in my experience, nothing has happened in this case until there has been an order imposed.

THE COURT:  Thank you.  Understood.

Please proceed, Mr. Bell.

MR. BELL:  I'm sorry, your Honor.

Let's not forget, your Honor, the defense is not working within some sort of void here.  Not only do they have a witness list, a witness list that is sufficiently robust as to the individuals we'd be talking about and certainly suggests why that, if anything, it sort of prompted the opposite of the complaint, there's too much, but they are also going to get 3500 on a schedule that surpasses not only the statutory requirements but what happens in most cases here.

So again, this is not extraordinary.  This is not beyond -- it is certainly not a situation where the defense is working from within some sort of a vacuum.  We have already, I should note, updated the exhibit list since initially issuing it, given our best and most current sense of the actual evidence that we use will be.  That is an example, by the way, of something that the Court did not order that has gotten done.

I4NQGRAc1

With all due respect to Ms. Necheles, I am not sure we are getting quite enough credit in that vein. But the idea that they can't fumble around through the dark and figure out what it is their clients have been charged with when they have been given a 20 page exhibit list, where they are going to get robust 3500 material, with respect to all of this stuff and all of these witnesses. When they've gotten a 20-plus page complaint, a lengthy indictment, a lengthy superseding indictment, it's kind of a farce, your Honor.

They have the guidance. They have guidance that surpasses other defendants in more complex cases in trials heard in this courthouse every day. With the additional representations, the letter I put in about limiting the role of other co-conspirators, which we will happily update, and we will happily accede to an order from the Court that we should update it periodically, the fact that they are groping in the dark here is baseless. It is baseless.

THE COURT: Thank you. Understood.

MS. NECHELES: Your Honor --

THE COURT: I don't think I need additional argument on this.

MS. NECHELES: Can I just bring one other fact to your Honor's attention?

THE COURT: No, I don't think I need additional argument on this.

I denied the prior request for a bill of particulars that was made by defendants on November 13, 2017.  I denied it during a conference held on February 26, 2018.  You can see Docket No. 124.  After that decision was entered, former defendant Harrington entered is plea on March 1, 2018.  Thereafter, on April 3, 2018, the government filed its superseding indictment at Docket No. 177.

Among other things, the superseding indictment expanded the scope of Count One.  It also added the additional charge with respect to misapplication, among other things, of government property.

Count One of the original indictment charged the defendants, "and others known and other notes, including CW1, Rechnitz" with "willfully and knowingly having devised and intending to device a scheme and artifice to defraud and deprive the NYPD and people of the City of New York of their intangible rights to the honest services of Harrington and Grant ... to wit, Reichberg and [Rechnitz] provided personal and financial benefits... to Grant and Harrington in exchange for official actions taken by Grant, Harrington and other members of the NYPD at Grant and Harrington's direction."  Docket No. 16, paragraph 13.

The superseding indictment, on the other hand, charges that Defendants (now only Messrs. Reichberg and Grant) "and others known and unknown, including Jona Rechnitz and CC-1

I4NQGRAc1

[Harrington], willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and to deprive the NYPD and the people of the City of New York of their intangible right to honest services of high-ranking NYPD officials, including Grant and [Harrington] ... to wit, Reichberg and Rechnitz provided personal and financial benefits ... to Grant, [Harrington], and other NYPD police officers, in exchange for official actions taken by Grant, [Harrington] and those other officers, and by other members of the NYPD at their direction."  Dkt. No. 177, paragraph 12.

The superseding indictment also added Count Six, which charges Defendants with conspiracy to misapply and convert property of a program receiving federal funds, under 18 U.S.C. Section 371.

In light of the superseding indictment, Mr. Reichberg and Mr. Grant again ask the Court to order the Government to produce a bill of particulars.

In connection with Count One, Mr. Reichberg requests: (i) the identities of the officials that Mr. Reichberg allegedly bribed, and (ii) the official acts that those officials allegedly performed in exchange for those bribes. *Id.*

I understand first request essentially to request that the government identify the co-conspirators.  Is that correct, counsel?

I4NQGRAc1

MS. NECHELES:  Yes, your Honor.

THE COURT:  Thank you.

He also seeks particulars pertaining to Count Six of the superseding indictment, namely:  (1) the identities of the other unnamed officers alleged in Count One to have participated in the conspiracy.

Again, I understand that to request the identities of the co-conspirators in the charged offense.  Is that correct?

MS. NECHELES:  Yes.

THE COURT:  Thank you.

(2) The specific resources allegedly misapplied or converted, and (3) the occasions on which those resources were misapplied or converted.

Mr. Grant joins Mr. Reichberg's request and seeks a bill of particulars that addresses the following additional categories:  (1) "The monetary value and time period of each benefit allegedly received by Mr. Grant throughout the course of the seven-year timeframe stated in the superseding indictment;" (2) "The contextual background and time period of each alleged official act committed by Mr. Grant;" and (3) "the contextual background and monetary value of each allegedly misapplied NYPD resource as stated in Count Six of the superseding indictment."  Docket No. 179.

In the interest of time I am not going to query further what "contextual background" is intended to mean and

why such a request for contextual background which appears to be a broad request for some narrative description what was happening at the time is appropriate for inclusion of what is properly termed a bill of particulars.

For the reasons I am going to describe now, the government is going to be directed to provide a bill of particulars with respect to the requests in Mr. Reichberg's letter. Because I don't believe that incremental additional requests made by Mr. Grant are appropriate for a bill of particulars -- which is called a bill of particulars; not a bill of context -- his additional requests are denied.

Legal Standards.

Federal Rule of Criminal Procedure 7(f) "permits a defendant to seek a bill of particulars in order to identify with sufficient particularity the nature of the charge pending against him, thereby enabling defendant to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense." *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987). The decision to grant or deny a request for a bill of particulars "rests within the sound discretion of the district court." *Id.*

"A bill of particulars is required 'only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is

accused.'" *United States v. Walsh*, 194 F.3d 37, 47 (2d Cir. 1999) (internal citations omitted).  It is not "a general investigative tool, a discovery device or a means to compel the government to disclose evidence or witnesses to be offered prior to trial." *United States v. Tuzman*, 2017 WL 4785459, at *13 (S.D.N.Y. Oct. 19, 2017).  "Instead, its purpose is to supplement the facts contained in the indictment when necessary to enable defendants to identify with sufficient particularity the nature of the charges against them." *Id*.  In the same vein, "acquisition of evidentiary detail is not the function of the bill of particulars." *United States v. Torres*, 901 F.2d 205, 234 (2d Cir. 1990), abrogated on other grounds by *United States v. Marcus*, 628 F.3d 36, 41 (2d Cir.2010).

Although "the line between mere evidentiary detail and information needed to prepare a defense and prevent unfair surprise can be thin indeed," *United States v. Rajaratnam*, 2010 WL 2788168, at *1 (S.D.N.Y. July 13, 2010), requests for evidentiary detail such as "whens," "wheres," and "with whoms" are frequently denied. *United States v. Mitlof*, 165 F. Supp. 2d 558, 569 (S.D.N.Y. 2001).  "The ultimate test is whether the information sought is necessary, not whether it is helpful." *United States v. Percoco,* 2017 WL 6314146, at *21 (S.D.N.Y. Dec. 11, 2017)

"Nor, given that a bill of particulars confines the government's proof to particulars furnished, should a motion

I4NQGRAc1

for a bill of particulars be granted where the consequence would be to restrict unduly the government's ability to present its case, or permit the defendant to tailor her testimony to explain away the government's case." *United States v. Wey*, 2017 WL 237651, at *17 (S.D.N.Y. Jan. 18, 2017)

Count One.

Defendants seek the identities of their alleged co-conspirators, including unknown officers who were allegedly bribed under Count One.  First, they also seek particulars concerning the official acts allegedly performed in exchange for those bribes.  The government responds that it has satisfied its burden with respect to Count One by providing extensive discovery and explicit notice to defendants -- including in the text of their opposition.  See Docket. No. 184, at 5-6.  For the reasons I will briefly describe, however, I don't think that this mitigates the need for a bill of particulars in this case naming the known co-conspirators, including NYPD officers and the official acts underlying Count One, to the extent that there are specific official acts.

Let me note a couple of things at the outset:  First, for the reasons just articulated, many of the concerns related to the use of bill of particulars as a discovery tool or as a way to confine the government's ability to present its case don't appear to be as significant here.  The government has already presented discovery and has already presented its

I4NQGRAc1

witness list and exhibits to be offered at trial.  Therefore, in the preparation of this bill of particulars, I understand that at this point the government does, as it should, have a clear view of the nature and extent of the proof.  Therefore, I don't understand this to significantly limit the ability of the government to prepare for trial.  On the other hand, I think that the need for it is enhanced given the expanded scope of Count One, which, as I noted earlier, is no longer admitted to the conduct of the two originally named police officer defendants.

First, although the government contends that the "core of criminality" of Count One has not changed, see Docket No. 184, at 4 note 1, I believe that the alterations significantly expand the scope of the crime charged in Count One.  For example, the superseding indictment makes clear that the object of the alleged conspiracy is no longer to deprive the public of the honest services of Grant and Harrington, but to deprive the public of the honest services of any number of unidentified NYPD officers through the acts of still yet other unidentified NYPD officers.

For that and these additional reasons, I believe that it is necessary for the government to identify those co-conspirators who were involved in the charged offense in order to allow Mr. Reichberg to prepare for trial and to avoid unfair surprise.  It is also principally or significantly

necessary because of the legitimate concerns raised by the defense regarding the possibility that conspiracies charged in the indictment charge multiple conspiracies rather than a single conspiracy.  I believe that because of that fact it is important for the government to identify with more clarity the scope of the charged conspiracy.  That way, the defendants, the jury, and I will be able to determine whether the government has proven the existence of that single-charged conspiracy as opposed to the rimless wheel that the defendants are concerned about.  As noted earlier, the government as already identified these people to the defense, and, therefore, I don't understand this to significantly prejudice the government.  It just holds them to their proffer.

As I explained with respect to the previous motion for a bill of particulars in this case, "there is no clear rule in the Second Circuit as to when a bill of particulars for unindicted co-conspirators should be granted." *United States v. Block*, 2017 WL 1608905, at \*6 (S.D.N.Y. April 28, 2017). "However, cases in which such a request is granted generally involve conspiracies with a large number of co-conspirators over a long period of time."  *Id*. (collecting cases).

In *United States v. Nachamie*, 91 F.Supp. 2d 565, 572 (S.D.N.Y. 2000), Judge Scheindlin stated that courts should consider the following factors in determining whether to grant a bill of particulars naming unindicted co-conspirators:

"(1) the number of co-conspirators; (2) the duration and breadth of the alleged conspiracy; (3) whether the Government otherwise has provided adequate notice of the particulars; (4) the volume of pretrial disclosure; (5) the potential danger to co-conspirators and the nature of the alleged criminal conduct; and (6) the potential harm to the Government's investigation."  91 F. Supp. 2d at 572.

I have considered all of those factors.

When presented with the prior motion for a bill of particulars, I concluded that, on balance, these factors did not warrant a bill of particulars.  Although a number of co-conspirators were referenced in the original indictment, and the duration of the conspiracy was relatively long, I found, in relevant part, that the government's pretrial disclosures made the scope of the charges that were being pursued at trial sufficiently clear.  The expanded scope of the superseding indictment and the continuing production of additional discovery has thrown that analysis off balance, however.

The superseding indictment refers to bribes to not only Mr. Grant and Mr. Harrington, but also to an unknown number of unidentified officers who were allegedly bribed by Mr. Reichberg and his co-conspirators -- not just Mssrs. Grant and Harrington.  Moreover, Count One of the superseding indictment indicates that the conspiracy includes acts taken by third-party officers at the direction of those other

I4NQGRAc1

unidentified officers.  The Court also notes that this significant expansion of the scope of Count One was effected weeks before trial following a year and a half of discovery.  This modification I believe has left defendants exposed to the risk of unfair surprise at trial.

Because the superseding indictment suggests that the Government may rely on information regarding a large number of as-yet unidentified NYPD officers or other co-conspirators to prove its case at trial, defendants need to know who they are in order to prepare for their defense.  As a result, a bill of particulars identifying the people who will be proved by the government to have participated in this conspiracy; namely, the unnamed co-conspirators or NYPD officers, is warranted.

Now I also believe that this is essential in order to protect against double jeopardy, the government has consistently stated during our conferences that Mr. Reichberg remains under investigation for potentially other crimes.  I do not know the nature of those other crimes or what they may be, but it does raise the meaningful concern of double jeopardy with respect to this trial which is going to go forward, hopefully, in short order.  As a result, I think that a bill of particulars is necessary to enable the defendants to plead double jeopardy in the event that they are prosecuted in the future for an act that was actually part of the conspiracy that was charged here.  See *United States v. Bortnovsky*, 820 F.2d

I4NQGRAc1

572, 574 (2d Cir. 1987); See also *United States v. Orsini*, 406 F. Supp. 1264, 1266 (E.D.N.Y. 1976) (a bill of particulars is designed, in part, to "permit the movant successfully to plead double jeopardy if he should be prosecuted later for the same offense"). The proffers that Mr. Reichberg remains under investigation for similar potentially related offenses makes this concern very tangible here.

Now, I also believe bill of particulars should outline the specific official acts underlying Count One to the extent they were committed by officers other than Messrs. Grant and Harrington. I believe that those details too are necessary with respect to the preparation for trial and also with respect to the issue of double jeopardy.

Now, I understand that the government maintains, and I was persuaded by the government's argument, that a specific bill of particulars concerning acts is inappropriate because Count One charges an as-opportunities-arise conspiracy. I appreciate that that is part of the nature of the government's case and that their case is not made up solely of the particular instances that might be identified. Still, to the extent that there are specific alleged official acts that the government seeks to prove, they should be identified in the bill of being particulars, whatever language the government wants to add in order to make it clear that they are reserving the as-opportunities-arise element of their charge, they may do

I4NQGRAc1

so.

With respect to Count Six, the defendants also maintain that they lack the information necessary to prepare a defense with respect to Count Six. They request (1) the identities of other unnamed officers alleged in Count Six; (2) the specific resources allegedly misapplied or converted or the other things included in Section 666 that people can't do; and (3) the occasions on which those resources were misapplied or converted or otherwise misused as prohibited by the statute. *Id.*

As I have described, Count Six was first charged in a superseding indictment. Under Count Six, the government charges from in or about 2008 up to and including in or about 2015, Mr. Reichberg "and others known and unknown, including" Harrington and Rechnitz "willfully and knowingly did combine, conspire, confederate and agree together and with each other ... to violate" Section 666(a)(1)(A) Title 18 of the United States Code by misapplying or converting property from a program receiving federal funds. See Docket No. 177 at paragraph 25.

In connection with this conspiracy, the government charges that Grant, Harrington "and other NYPD officers without proper authorization from the NYPD agreed to and did cause NYPD resources ... to be used for the personal benefit" of Reichberg, Rechnitz and their "friends and associates." *Id.*

I4NQGRAc1

Paragraph 26.  I am not persuaded by the government's argument that Count Six solely addresses conduct that was already charged in the original indictment, and that that makes the need for a bill of particulars unnecessary.

Now, despite the voluminous discovery produced in this case, the defendants assert that they lack a sufficient "roadmap" given the late interposition of this charge.  See *United States v. Bin Laden*, 922 F.Supp 2d. 225, 234 (S.D.N.Y. 2000).  "Citing *Bortnovsky* 820 F.2d, 525.  And as I noted earlier, discovery in this case not only has come in over and extended period of time but continues to come in, including subsequent to my most recent decision with respect to the government's prior -- I'm sorry -- the defendant's prior request for a bill of particulars.

As observed in *Bin Laden*, sometimes a voluminous production "is precisely what necessitates a bill of particulars."  In this context in which discovery continues to be produced, I believe that this voluminous production does also drive the need for a bill of particulars with respect to this newly added charge.

Now to the extent the government has informed defendants of specific examples of conduct that it intends to argue constitutes criminal conduct at trial, again, the bill of particulars may simply be easy to prepare.  I expect, again, that this will not significantly impact, if at all, the

government's proof at trial, given they have already assembled the documents, their witness list and the relevant evidence. At this point, however, I believe it is necessary in order to permit the defendants to adequately prepare for trial to put some clear confines around the case that will be presented.

Furthermore, although defendants request information concerning the resources allegedly misapplied and occasions in on which the misapplication occurred, the request is not one that would improperly require the government to "reveal" the "manner in which it will attempt to prove the charges." *United States v. Rittweger*, 259 F.Supp.2d, 275, 291 (S.D.N.Y. 2003). As I said earlier, the government has already revealed through its witness list and its exhibits much of that information.

But, moreover, Count Six requires the government to prove a conspiracy to misapply property valued at $5,000 or more. Therefore, I believe that defendants who are confronted by the large volume of discovery need to know what the property was and the details of the alleged occasion of misapplication in order to adequately prepare a defense. Moreover, whereas here there is a monetary threshold that must be met with respect to the alleged conspiracy, it would be very difficult for defendants to prepare for trial without knowing what resource was allegedly misapplied, the circumstance of the misapplication and the identity of the alleged co-conspirators.

In addition, with respect to this issue, a bill of

particulars too will clarify the scope of the conspiracy charged in Count One allowing the defendants to interpose a plea of double jeopardy in the future if necessary.  So I am going to direct the government to produce a bill of particulars.  Following our break, I will ask you to state by when you expect you will to be able to do so.

One note as well, just as, I'll call it, an aside, United States, as you're putting together the list of co-conspirators, please keep in mind the holding of *U.S. v. Carpenter*, which, again, the defendant's motion on duplicity brings to top of mind; namely, that the government cannot "redefine a conspiracy by its purpose rather than by the agreement of its members to that purpose."  See also United States -- let me leave it at that.  So we have a clear sense of what it is that the government will be putting in evidence.

So I propose to take our break now.  I expect after the break to hear from the defense about your desire for a continuance.  My hope is that with this bill of particulars forthcoming, it may inform, as Ms. Necheles said, their decision regarding when they will be prepared to go forward.  I will also look to the government to tell me when they can provide this bill of fix.  Again, I hope it will be something that they can produce in short order and that will not be a great burden given all of the facts that Mr. Bell has proffered regarding the information already produced to the defense.

I4NQGRAc1

Also, during this break we can talk more about transcripts, and then we'll talk about the voir dire, and I think that that will complete my agenda.

It is 1:06 now. I propose to come back at 1:30 to finish our conversation. Is that acceptable to each of you?

MR. BELL: It is to the government, your Honor. May I ask one I guess quasi-logistical question about your Honor's order?

THE COURT: Please.

MR. BELL: As I noted, we filed a submission earlier listing certain officers' official acts, that was not part of the bill of particulars order. We did so keeping the names of the officers essentially as part of a key, and we disclosed that key separately to counsel for Mr. Reichberg and for Mr. Grant. I imagine that the bill of particulars here would be publicly filed, and I wonder whether we could continue in that practice with respect to the actual filing of the bill of particulars when it comes to officer names.

THE COURT: Thank you.

I will consider that issue. I would like to hear from the defense, but I will give each of you the opportunity to consider the issues. Thank you for raising it. I hadn't considered that before.

MS. NECHELES: Judge, there's a lot of requests for secrecy in this case. I don't get it. These are the charges

against the defendant. That is typically not secret. The bill of particulars is saying this is what these men could be convicted of doing and these are the charges. I don't understand. We will be discussing this with other people and sharing this information with other people. We have to do our duty.

THE COURT: Thank you. Good.

Let's take our break. I will consider this issue. I am not sure I will be able to rule on it now since I want to do some research on the question. I will see you back here shortly to discuss the other issues on the agenda.

(Recess)

THE COURT: First, thank you for accommodating that short recess.

There are a number of things on the list of items for us to discuss still.

Before we turn to those, can I ask whether the defendants have a view regarding how long of a continuance you would like to request as a result of the issues raised in your letter of last evening?

MS. NECHELES: No, your Honor. Thank you for giving us the time to discuss this. Unfortunately, Mr. Reichberg really needs to discuss this with his rabbi, who is in Israel. So we are hopeful that he will be able to discuss it in the next couple days. Certainly, we expect that by Thursday we

I4NQGRAc1

could tell your Honor whether we will be asking for a continuance.

THE COURT:  Thank you.  Fine.  The issues raised were made not only on the part of Mr. Reichberg but also with respect to Mr. Grant, or at least Grant is potentially equally impacted by the asserted delays in the government's production of documents.

What's your perspective, Counsel?

MS. CAPPELLINO:  Thank you, your Honor.  We would also hold off on deciding this issue until Mr. Reichberg's Rabbi is able to be spoken to.

THE COURT:  Thank you.  So, I take it from that that Mr. Grant does not independently wish to seek a continuance?

MS. CAPPELLINO:  No, your Honor.  We'd rather discuss that with co-counsel and proceed together on that decision.

THE COURT:  Thank you.

Now I'm happy to provide the defense with some additional time to think about what the remedy is that they seek with respect to the concerns raised in that letter, referring to the April 22 letter.  The question that I have is why until Thursday?  Today is Monday.  Thursday is several days from now.  The trial is two weeks from now.  It would certainly be useful to know before then.

MS. NECHELES:  And so, honestly, I hadn't really got before coming to court today that we'd be talking about a

I4NQGRAc1

severance -- I don't mean a severance -- I mean an adjournment. I apologize.

The rabbi is a big rabbi, and to get in touch with him in Israel, we have to speak first to his gabbi or assistant, who then arranges a time, and given the time issue, we will endeavor to get back to your Honor and the other side as quickly as we can. I just don't know how, you know, sometimes it takes several days to arrange an appointment to speak to the rabbi.

THE COURT: Thank you. Understood.

So I am going to direct that if the defense wants to request a continuance that the request be made no later than noon on Wednesday. We need to know what we are doing in this case and perhaps a deadline will help move the process along. You should write me a letter that will be submitted no later than that date and time.

Counsel for the United States, have you considered by when you can produce the bill of particulars?

MR. BELL: We believe, your Honor, that we can produce -- today is Monday. We can produce a bill of particulars by -- just one moment -- by Friday?

We also, your Honor, would note that we have certain deadlines I think in this case, pretrial deadlines that are attached to the trial date, which is to say that we, for example, are supposed to produce a certain subset of 3500 by a

I4NQGRAc1

certain time prior to trial.  As we don't yet know what the trial date is going to be, owing to, I guess, this issue with Mr. Reichberg's rabbi, I don't know that it's fair to treat those issues as though the trial were going to happen.

By way of example, we got from your Honor, after a fair amount of vigorous negotiation and considered thought on your Honor's part, a deadline for certain 3500 material involving witness Jona Rechnitz.  Assuming for the moment that the trial goes on as scheduled on May 7, that material -- and there are substantial, substantial volumes of it -- would be due today.  What I would ask is that until we have some level of certainty, that that deadline be put over until Wednesday. If we hear Wednesday that things are going forward as scheduled, we put that out the door.

If not though, wild hypothetical, if there is a continuance until, say, October, that material, it seems to me, shouldn't be produced months and months and months in advance of when trial would happen for myriad and obvious reasons.

THE COURT:  Thank you.

MS. NECHELES:  Your Honor, to be clear, we will not be asking until October.  At most we will be asking two or three weeks.  We will not be asking until October.  And we don't even know that we are asking two or three weeks.

Given what the government has just said about the voluminous amount of material and the fact that what we're

I4NQGRAc1

talking about here is the fact that they dumped voluminous amounts of material on us already that is making it so difficult, we would ask -- and that we don't know at this time that we are adjourning it, we would ask your Honor to keep with the schedules that we have already in place.

THE COURT:  Thank you.

I'm going to grant the government's request and adjourn their obligation to deliver pretrial materials, including 3500 materials, until we understand the defendant's position with respect to any anticipated request for continuance.  I think that is fair.

As I said, I am mindful of the significant concerns that the defense has raised in their April 22 letter, and I am not at all confining the length of the anticipated request for continuance.  If defendants believe that they need a lot of time to meet this evidence, I will happily consider such an application.  And so at this point I don't know what the request will be.  I appreciate your comment, Ms. Necheles, but I also don't know what the position is of Mr. Grant.

So I am going to adjourn the obligation of the government to produce the 3500 materials.  I expect to maintain the proportionate gap in time between the current production dates and our anticipated current trial commencement date and whatever the commencement date is in the event that a determination is made to continue the trial.

MS. NECHELES:  Your Honor, if we do ask for more time, and I expect that it will be only two or three weeks, will your Honor be available or be able to go forward?  I don't want to leave it out here that there is a potential -- we don't want until October.  The defendants cannot afford it.  They cannot go on this way, and we need to balance their speedy trial rights and their inability to have this pending over them for years against the dilatory tactics of the government here.

So we are not going to ask for October.  I am telling you.  We have discussed this.  That is off the table.  So we just want to make sure if your Honor is not going to be able to do this in two or three weeks, we are not asking for any adjournment.  So we would ask to be able to go ahead today and get the materials that we would be getting otherwise.  Your Honor, I really believe there is a chance we are just going on the 7th.

THE COURT:  Good.

MS. NECHELES:  So I'm concerned about more delay here and the government giving us voluminous materials.

THE COURT:  Thank you.  Understood.

I would have them give it to you if we didn't have this additional consultation to conduct.  But given that, I think that the government's request is appropriate.  If the defense believes it is capable of making the decision about the continuance without that additional consultation, that is up to

I4NQGRAc1

the defense.  But based on the desire to accommodate that request, I think that the government's response is reasonable and proportionate.

With respect to my schedule, just so you have a sense, as I said earlier, I do have another trial that is scheduled to begin on July 9.  And I was, frankly, not planning to be here for the entire week of the 4th of July.  So I am not sure that we have enough time in the schedule to accommodate a significant continuance if we don't push it out further until the late summer or fall, just as a data point.

MS. NECHELES:  Your Honor, what date would that mean then?  I know that June 21 is a Jewish holiday.  I'm sorry, May 21 is a Jewish holiday so Mr. Reichberg would not be able to come to Court that day.

THE COURT:  I should tell you that I am out on the 31st of May and the 1st, regardless of what we else we are doing.  So my strong preference would be to either have an extended continuance or to have a relatively limited continuance so that we can complete the trial in the window that I had already anticipated.

MS. NECHELES:  If it ended up getting adjourned to May 22, would that be a doable time?

THE COURT:  I'm sorry, May 22?

MS. NECHELES:  Yes, right after the Jewish holiday.

THE COURT:  I'm not sure if that would give us enough

I4NQGRAc1

time, if the trial lasts as long as you anticipate, counsel; namely, six weeks.  That would give us four trial days that week, three trial days the following week, which is, I'll call it, just a week and a half.  Then we are up through June.  I have a number of other things during that month scheduled that I think I can mostly move.  I have a few things I can't.  I'm not assuming that will work if we have a six-week long trial.

MR. BELL:  May we confer briefly with Ms. Necheles?

THE COURT:  Thank you.

(Pause)

MS. RAVENER:  Your Honor, we were hoping to reach agreement with defense counsel about this, but we have a proposal that we think might assist the Court.  We would suggest that perhaps we could start on May 22, but do jury selection the prior Monday so we could save some time in the schedule and make sure that May 22 is a clear start for the trial and the substance of the trial.

In addition, the government just wants to be clear, we strongly feel that the trial will not last six weeks, and the government's presentation of evidence will not exceed three to three and a half weeks even accounting for extensive cross-examination of our witnesses.

THE COURT:  Thank you.

MS. NECHELES:  Your Honor?

THE COURT:  Yes.

I4NQGRAc1

MS. NECHELES:  We were in the middle of conversation before Ms. Ravener walked away about this matter.  And so what I was saying to the government was that it was possible we would agree to start the trial before, based on we still have to speak to Mr. Reichberg's rabbi, but if we are going to be taking time away from trial prep, we would ask that we get the 3500 material two weeks before the day that we're starting picking the jury if we're going to be taking time away to do something else.  Otherwise -- we're overwhelmed.  We need whatever time we have.  And the main thing will be, of course, this voluminous 3500 material.  There are 50 witnesses on this witness list and just an amazing amount of material.  So, yes, we would consider taking time out and picking a jury first if that would make things easier.

THE COURT:  Let me just say this:  I don't think it would be easier for us to pick a jury on the 14th and start on the 22nd.  That is not easier.  My preference would be to pick a jury and to try the case.  So I understand that suggestion to be an accommodation to the -- proposed accommodation to the defense.

MS. NECHELES:  No, I think it was because the government is worried about getting the time in and making sure that we have enough time to get it done.  I don't believe that was an accommodation to us.  That was a suggestion by the government.

I4NQGRAc1

THE COURT:  Thank you.

I understand the concerns.  If we knew now what the plan was, I would direct the government to turn over the materials now, but in order to accommodate the request to allow defense s consultation with another person in connection with this decision, I believe it's appropriate to Grant the government's request.  Again, if it was known now we were proceeding on the 7th, this would not be an issue.

Let me say that I hope to hear from the parties as promptly as possible regarding that issue.  And we will then decide when the trial will begin and when the government's production of documents, which will be linked to that trial commencement date, should commence again.

Counsel for defendant, if you believe that you expect to begin the trial on the 7th, you may wish to curtail this period in which you engage in this outside consultation in connection with this decision.

That leaves us with some other issues, the first of which I think I'll take up is the voir dire issue.  There are a set of comments I have received regarding the voir dire.  I would like to take them up in order.

First, there is a request by defendants that I ask all jurors to raise their hands if their answer to any individual question is yes, and for me, the Court, to note which of the group of people who have appeared in the venire have raised

I4NQGRAc1

their hand in response to each query.

Which lawyer for the defense would like to speak to this issue?

MS. NECHELES:  I would, your Honor.

THE COURT:  Thank you.  Please go ahead.

MS. NECHELES:  Your Honor, that's how I -- when I was in front of Judge Koeltl, that's how he did it, and I thought it was very effective because it's hard for jurors, I think, to remember 53 questions, and it was effective because that way anything --

THE COURT:  Can I just interrupt?  Do you understand that I will be handing each juror the complete set of voir dire questions and a writing utensil?

MS. NECHELES:  No, I did not understand that, your Honor.

THE COURT:  Thank you.

MS. NECHELES:  I thought you were going to read them all.

THE COURT:  I will read them all.

MS. NECHELES:  I understand now, your Honor.

THE COURT:  Thank you.

Yes, on the first page of the proposed voir dire, it says, "Please indicate if your answer to any of the following questions is yes by circling the number of that question."  And then it goes on.

I4NQGRAc1

My intention, to be clear, is to hand each member of the venire a full copy of the request together with a writing implement, and then they will mark it.  So my expectation is that, in essence, I will outsource to the individual venire members the recall question.

MS. NECHELES:  I understand.

THE COURT:  Is that acceptable?

MS. NECHELES:  Yes.

THE COURT:  Good.

Let's talk about question 53.  There are two separate questions.  One is the background issue regarding the missing witness instruction.  I will say up front that I am not sure I need to make that decision now in connection with the voir dire itself.  I can modify the question to eliminate that element of the question if it would be helpful.  That said, it's not clear to me why the instruction would not be appropriate in the case as a whole, which is, in essence, what the government raises in response.

Can I hear from the parties on this issue?  And I think I'd ask to begin with that second question first; namely, why would an instruction of this sort not be warranted in this case?  And then I can turn to whether the modification is appropriate in the voir dire questions.

Counsel for defendant, either defendant.

MS. NECHELES:  I don't know that I have the right

I4NQGRAc1

numbers.

THE COURT:  The letter is the April 6 letter.  I don't know that I have the number for it.

MS. NECHELES:  Yes, your Honor.  The issue here is that the government, I think, may be alleging here that some people were bribed.  Some police officers were bribed and took actions.  I don't mean Mr. Harrington.  I mean, other people who the government may be alleging, And those people may still be working for the police department.  And it will be our contention maybe, maybe at the end of the trial that a missing witness charge should be given that those people could have been produced by the government.

I don't know yet, but I'm not saying that they should draw inference with respect to Harrington or Banks, but there might be other people.  I don't know what is going to happen in this case, in part, because we don't really know who the government will be alleging took acts.

THE COURT:  Thank you.

It's not clear to me, given the fact that both parties have the opportunity, an equal opportunity to subpoena witnesses at trial that I would be giving an instruction other than that that is currently embedded in question 53.  That said, I don't know that I need to make that decision now.

Government, what would be your response to the proposed deletion of the second sentence from question 53 and

the word "also" from the third sentence of question 53?

MR. BELL:  The second sentence, your Honor, is consistent with jury instructions, and I don't know that I've come across an instance in years of practicing here for which that did not apply.  I think that the "also" I guess in isolation can sort of come or go.  I think that so long as the core of the sentence is preserved:  "You may not speculate as to the reason why other persons are not on trial," I think that's fine.  And there too, your Honor, I also have not seen a circumstance in which that is not the law, where that does not apply.  That's our position, your Honor.

THE COURT:  Thank you.

I don't have a clear view as to why I would not provide the instruction that is embedded in the second sentence of 53 at the charging conference.  But I don't know that I need to instruct the venire on this issue in order to adequately question them about the issue.  So my proposal is going to be in response to this, to delete the second sentence of 53 and to delete the word "also" from the third sentence of question 53.  That will be responsive to the defendant's concern and will push back the question of the jury instruction to the time that we have to decide on jury instructions.

MR. BELL:  May I be heard very briefly before we move on?

THE COURT:  Please do.

I4NQGRAc1

MR. BELL:  The only thing I suppose that I could imagine is this:  We are -- Harrington in particular is going to come up a fair amount at trial.  He's going to come up in openings.  He is going to be a looming presence hanging like a specter through the entirety of what will be a lengthy trial.

I can imagine, human nature being what it is, jurors tend to ask, well, you know, why just this guy among the cops?  They'll understand where Jona Rechnitz is.  That doesn't create the same issue, but why just why only this guy as opposed to the other guy who is being named about as much.

I don't think that there is any great harm in providing an instruction that is, strictly speaking, correct, like indisputably correct.  I do think there is a benefit in that jurors are told rightly, eyes up in front of you, these are the defendants who are charged, whose guilt or innocence you are determining, and you don't have to worry about anyone else.

I think that particularly in a lengthy trial where there is another figure who looms large in the proceedings who will be mentioned a lot, there is a benefit to mentioning that at some point before the end of the trial, which by defense's reckoning, may well be weeks and weeks and weeks from now.

THE COURT:  Thank you.

Let me just comment on that.  I would expect to, in any case, include the sentence that would read:  "You may not

I4NQGRAc1

speculate as to the reasons why other persons are not on trial." It's the defense's desire to preserve the prospect that they could argue that the government should somehow be viewed unfavorably because it chose not to call people that is at issue here.

MS. LONERGAN: Your Honor, if I may. I think defense counsel's concern is about a missing witness instruction, but the language of question 53 actually only speaks about defendants. It talks about defendants who are and are not on trial. So I don't actually think that striking the sentence has anything to do with whether a missing witness instruction is important. It has to do with whether about defendants at the table. So I actually don't think that it is necessary to strike that sentence. I don't think that sentence has anything to do with the concern that Ms. Necheles has articulated here.

THE COURT: Thank you.

Counsel.

MS. NECHELES: Your Honor, I think that if you look at the first two sentences, I expect that some of this may involve criminal activity committed by individuals who are not on trial here. It doesn't say who are not defendants in this case. Not on trial here. It's just there is going to be witness evidence about other witnesses. "I instruct you don't draw inferences, favorable or unfavorable." It does go to the missing witness issue, you know, that there are people who may be -- I'm not

I4NQGRAc1

saying we're going to be asking for missing witness.  I have to see what the evidence is in this case, but it's possible that there will be something -- and I do think actually, Judge, it's not the biggest deal in the world, your Honor.  It's one sentence in the middle of something.  I just think that it's a little misleading to put that sentence in.  I ask you to leave it out.  I don't think anybody, frankly, in the jury listening to this is going to hear all that much about it.

THE COURT:  I agree with you on that front.  I am, again, happy to take this out.  I don't think that I need to instruct them on this issue at this time.  I do not take a position now regarding whether or a missing witness instruction is appropriate or whether, I'll call it, a more common instruction stating that they may not hold the failure to call any person against either side because both sides have equal capacity to subpoena witnesses to appear here will be appropriate.

But I will delete the second sentence.  I will include the third sentence, which will address the issue raised by Mr. Bell; namely, by letting the venire know that they should not speculate about reasons why other persons, particularly Mr. Harrington in this case, are not on trial.

With respect to question 63, I am going to propose that I delete the words "or empathy" from that question.  I think that the question posed, referring just to sympathy is

appropriate and tracks what I anticipate will be the ultimate charge on this issue.  I agree with the defense, the words "or empathy" do not detract from the juror's oath.

This question is on the government's side of the equation unlike the preceding questions, so I'm not sure the words "bias or sympathy" should be included in this question.

That's my proposal with respect to 63.  Are there any concerns about that?

MS. NECHELES:  No, your Honor.

THE COURT:  Thank you.

Government?

MR. BELL:  No, your Honor.

THE COURT:  Good.  Thank you.

That takes us to the government's comments.  I will say that the case script that the parties have proposed is acceptable to me.  I will include it in my first day script that I will be reading to the jury or the venire when they arrive.

I specifically excluded the proposed question that government is asking that I include here.  I have a number of concerns about that language.  Let me say a few reasons about my concern, so I can hear targeted arguments with respect to them.

These questions are proposed to be read to all the members of the venire without the introductory language that I

I4NQGRAc1

will be saying to the jurors at sidebar as the government proposes; namely, I would not be saying as the introduction to each of these questions that -- I am not suggesting that this favor benefit from your personal experiences against the law. So, I'm somewhat concerned about, I'll call it, priming the pump with the jurors by asking these questions in a way that may make them think that this is inappropriate conduct.

I'm also somewhat concerned about the proposal that, I will call it, I bless in advance the answers that will be given to me at sidebar by telling them in advance that I am not suggesting that what they did was improper.  I don't know and won't know whether or not their conduct is improper until they come up and tell me about it.

So those are among the reasons that I was concerned about asking these specific questions.  This is a case about improper benefits to officers.  They will know that at the time that I'm asking these questions, and I'm afraid, in essence, that this will signal to jurors that we believe that this is improper conduct.

I'm also somewhat concerned, I should say, that we may get a number of false positives such as, "Yes, I begged a police officer not to give me a speeding ticket."  I don't know what we would do with that kind of a response.

(Continued on next page)

I4nrgra2

Those are among the concerns that led me not to include these proposed questions. I'd like to hear arguments with respect to these.

I will also note as an aside, in narcotics cases we don't ask prospective jurors whether they have ever smoked marijuana or tried cocaine. This is a case about bribing police officers. You are proposing that I ask each of the members of the venire whether they have engaged in conduct that we are saying is the subject of the criminal activity that the federal government is prosecuting. Those are the reasons why I didn't originally include these questions in the proposed script, but I welcome argument from the government on these issues.

MR. BELL: Thank you, your Honor. Two things on that. First, in our collective experience, even in the narcotics context, we have asked questions that if they weren't those questions, they were awfully close. The reason for that is essentially to suss out behavior that would in fact be very relevant to the ability for folks to weigh these issues impartially, not necessarily on their own, but at least to follow it up with is there anything about that experience that would make it difficult for you to be impartial.

THE COURT: Let me respond to that. I have never asked each member of the venire, have you used marijuana or have you used cocaine. I have asked a question along the lines

I4nrgra2

of:  Do you believe that the United States should not prosecute the narcotics laws? is there anything about the fact that this case involves the use of drugs or whatnot that would make it difficult for you to be a fair and impartial juror in this case?  Those questions don't require every one of the 60-odd citizens here to tell me whether they believe that they have personally broken these laws in order to be considered as a juror in the case.

MR. BELL:  Understood, your Honor.  I think there is a rationale separate and apart from the fact that we have had questions like that before, and I think that the way that your Honor deals with the narcotics context and floating that issue in the way that this Court is fine.

There is a little distinction here only because the crime that we have alleged here, that we have charged, and the way that we have alleged it as an as opportunities arise sort of compensation scheme and conspiracy is such that it can fairly be seen as a pastiche of a number of acts in both directions that on their own might be perfectly benign and that on their own, because they are perfectly benign, may make it difficult for a juror to recognize that the whole arrangement, the sum of the pastiche, is illegal.

We want to get your Honor to the same place that your Honor ultimately gets to with respect to the narcotics question.  I think it demands a little bit more here, where so

I4nrgra2

much of the crime is the sum of a bunch of things that only acquired an illegal quality to them because of the whole illegal arrangement.

The concern that we have is sort of a baby and the bathwater type thing.  Obviously, we don't want to unduly point fingers at the jury or put a finger on the scale or a perceived finger on the scale that suggests to an undue degree that this stuff is wrong.  At the same time, though, the jurors' experiences with respect to these individual actions that in total marry quid and quo are problematic in the way that we have alleged would seem to us to be highly, highly relevant and to present a challenge that we don't see in the run-of-the-mill narcotics case, where we are trying to get jurors to appreciate that a bunch of things that in isolation may not be problematic, here in fact are.

We would be very open, your Honor, to some other way of eliciting these questions that doesn't create dirty bath-water.  But we are concerned about the baby.  We think that this is something that should be elicited in some way because it does have a great deal to do with the jury's ability to be fair against the backdrop of their own experience and our ability to make that assessment and to use our strikes appropriately.

THE COURT:  Thank you.  In your letter you propose that I make this statement about this conduct not necessarily

I4nrgra2

being against the law.  Is there a way to build that kind of statement into the proposed questions themselves?

MR. BELL:  I tend to think there is, your Honor.  I'm not sure that we have it immediately at hand.  We welcome the opportunity to put something together.  This would be a one-off, very brief letter that perhaps accomplishes that.

I will say, your Honor, in response to one of the concerns that you mentioned before, I don't think that your Honor would necessarily be passing judgment on what the jurors bring to you in one way or the other by essentially saying I'm not here to say that this is against the law or not.

I think it would merely be your Honor saying, correctly, I'm not here to say whether this is against the law or not.  It's not positive judgment, it's not a negative judgment.  It is purely in the vein of we are trying to get information from you that will help our process.

Perhaps, your Honor, it would be most appropriate for us to follow up by letter on this within the next couple of days if we can find a formulation that does everything the Court wants it to do that addresses these concerns but at the same time gets meaningful information out there for not only the government but for the defense to be able to consider.

THE COURT:  Thank you.  Have you also considered framing this in a way that doesn't require the jurors to answer the factual question out loud along the lines of what I just

I4nrgra2

described for a narcotics case: in the event that you have done the following conduct, is there anything about that conduct that would lead you to be unable to be fair and impartial as a juror in this case?  That would not reveal or force the prospective juror to reveal the fact, but it would get you to the bottom line answer.  It does not give you the individual fact though.  I just want to raise this as a question.

MR. BELL:  Your Honor, that's very well taken and I think would, with your Honor's indulgence, probably be built into whatever we propose by letter.  That category of potential question, that form of potential question, may give us an out that avoids some of the concerns that your Honor raised.  We would like the opportunity to word shop and wordsmith it very briefly among ourselves and submit something later in the week.

THE DEFENDANT:  Ms. Necheles.

MS. NECELES:  The question that the government is asking or proposing and what Mr. Bell says, he wants to get at the issue of whether the people have ever asked a favor of a police officer.  What he said is there are a lot of things that taken alone are not illegal but then put together might add up to something illegal.

But asking police officers a favor is what citizens are supposed to do.  If I lose my kid, I ask the police officer, can you help me find my kid?  If I need to cross the street and I'm having trouble, I ask the police officer, can

I4nrgra2

you help me cross the street. They are public servants. That's what you do. So the question by its nature is suggesting there is something improper about something that is not improper.

THE COURT: Thank you. That very much is my concern and is part of what underlies my comment earlier that this may elicit a number of false positives.

MS. NECELES: But it is not only that, your Honor. It is suggesting to the jury from the beginning that there is something wrong with that. And the crime here is not asking favors from police officers. Even if it is asking favors for improper things, that is not a crime. The crime here is bribing someone, entering into an agreement.

Even an agreement to add a stream of benefits, it still has to be an agreement, an agreement that I'm giving you this in exchange for benefits. It's a bribe crime, not a crime of I'm your buddy and you're going to do me favors, not even a crime of I want to cultivate good will with you. The jury instructions will tell the jurors that is not a crime, merely cultivating good will, and getting favors from police officers is not a crime.

The question here is have you ever had any experience with a bribe. That question is already there in question 46.

THE COURT: And I will say it is for those reasons that I originally excluded these questions.

I4nrgra2

MR. BELL:  I think, your Honor, that in our putting something together for you we can come up with phrasing that will eliminate and filter out those de minimis examples.  It does seem to me, though, if prospective Juror No. 2 has in fact paid for $8,000 worth of window work for a police officer for no particular reason or has given a police officer a seat on a $50,000 private jet with a prostitute for no reason, even in the absence of a quo, it is probably the sort of thing that the voir dire process should suss out.

THE COURT:  Let me say that I appreciate the need of the parties to ask appropriate questions of the venire, and I will provide the parties the opportunity to do so.  I am still concerned about I'll call it priming the pump for the jurors regarding the nature of this offense and also improperly suggesting to a number of citizens that perfectly lawful conduct is improper.

I will allow the government to wordsmith this issue and direct that any proposed reframed questions be presented to me no later than this Wednesday, also at noon.  I will evaluate whether or not to include the proposed revised language.

MR. BELL:  Thank you, your Honor.

THE COURT:  Thank you.

Counsel for defendants, if you wish to respond, you will be required to do so no later than Thursday at noon.  If I see no objection to the government's proposed language, I will

I4nrgra2

understand it to be acceptable to the parties and will use it.

I think that that substantially completes the issues on the agenda for today's conference with the exception of the appending Brady requests, which are addressed below. I believe that is essentially rolled into the issue regarding the defendants' desired length of a continuance, to the extent I need to, to continue to advise the United States of their obligations to comply with their Brady obligations under the law.

I think the transcript issue is also one that is addressed by the request for a continuance. Let me say that I would very strongly encourage the parties to work together to stipulate to transcriptions of recordings that would really add a lot of time to the trial.

MS. NECELES: That is not going to be possible. The government has given us 134 transcripts which are draft. They are not even close to ready. I believe that we may be unable to enter into a stipulation that if a witness were called, they would testify that this would be what the transcript would be. I'm not stipulating to the accuracy of their transcripts. They are not close to accurate.

I don't have time to keep going through these 134. If they will give me a stipulation like that, I will be willing probably to give them a stipulation that a witness would testify, and if there are really inaccurate transcripts, I will

bring them to the Court's attention. But their transcripts are a disaster right now. They are first drafts and they are wildly inaccurate.

Your Honor, I said from the beginning of this case that every time you try to transcribe something to listen to it to see what it is like, it probably takes three to four times to listen to it as the length of the tape. This is about, I would say maybe it's about 10 hours of tape, I don't even know. You have to go find them. It takes three, four times as long to listen to them, to try to get it right. I just don't have the manpower or ability at this point to try to listen to their transcripts and to try to figure out what's in it. The best I can do is read them and find things that are relevant for the defense.

I asked them for months. I will not be able to stipulate to the accuracy of their transcripts at this point.

THE COURT: Thank you. Understood. It is unfortunate. It will likely add to the length of trial. But I appreciate where we are as a result of the process that's been used to lead up to the trial date.

Return of Reichberg's electronic devices. What more is there to be discussed with respect to this issue? United States, are you prepared to respond?

MS. RAVENER: Your Honor, we have responded to this. To be clear, we have responded to the Brady letter as well.

I4nrgra2

THE COURT:  Thank you.

MS. RAVENER:  The bottom line, your Honor, is for the same reasons that we outlined in our marital privilege submission to the Court, we cannot return the electronic devices.  They are physical evidence in the case.  Nor can we return portions of the forensic copies that were made.  It would impair our ability to authenticate the evidence at trial.  It also threatens the integrity of the evidence.

I will give you a brief example, your Honor.  The government recently tried in a different case, I think before Judge Gardephe, in which an email account was believed to be empty.  Then at trial the defendant introduced emails purporting to be from that account.  Thankfully, the government had not returned and deleted all copies of the purportedly empty account because further investigation was warranted and it turned out that those emails were a fraud.

That is just one example, your Honor, of why we need to maintain the complete set of the email accounts and the devices in our custody through trial.  And let me be clear, your Honor.  My understanding is that at that trial they were able to go get a renewed warrant in order to conduct that search and demonstrate the falsity of the evidence.

It is really a question of making sure that the government is equally situated to maintain the integrity of the evidence and to authenticate the copies.  That people who, for

I4nrgra2

example, did the forensic extractions on these cell phones can only authenticate the full copy, they can't authenticate just pieces. That's not how it works.

We have been working with the defense. We have been asking them to work with us on what things they will stipulate to. But this just isn't something that we believe is appropriate. I think Ganias recognizes that that is an issue that remains unresolved. The government is trying to ensure that we balance these interests. We don't intend to query the items beyond what's been identified other than the materials, like I said, that we have set aside or absent a new warrant.

THE COURT: Thank you. Understood.

Counsel for defendant, anything else that you would like to offer at this time?

MS. NECELES: No, your Honor.

THE COURT: Thank you.

I am going to deny without prejudice the request to return these devices at this time. I say deny without prejudice because I am evaluating this request at this point in time. The trial has not yet even begun. As Ms. Ravener pointed out, the Second Circuit in Ganias articulated a number of valuable reasons why the government may retain certain physical copies of electronic evidence for investigation. Here the government has not yet even tried this particular case. So I think the time for me to order the return of these devices

I4nrgra2

has not yet come.

Whether and to what extent the government will be permitted to retain the seized devices following the trial of this case is an open question.  But I believe that at this point in time, when the charges are still pending and trial has not yet begun, it is not appropriate to require the United States to hand over these devices.  It may be useful for authentication of relevant records at trial and otherwise.  So I am denying the request without prejudice to return these devices at this time.  Again, the denial is without prejudice to renewal at a later stage in the life cycle of this litigation.

What else do we need to discuss today?  I am very mindful of the fact that I also want to read you my logic behind the decisions on the motions in limine.  I'm also mindful of the hour.  So I may bring you back for that separate purpose since I have already informed you of the ultimate decision with respect to each of those issues.

Counsel for the United States, anything else that you would like to raise?

MS. RAVENER:  Your Honor, we would raise our request with respect to clarification and amendment of the 3500 protective order.

THE COURT:  Thank you.  I'm sorry.  I should have discussed that.  Anything else that the defense would like to

I4nrgra2

raise beyond discussion of the 3500 material letter submitted by the government over the weekend?

MS. NECELES:  I don't believe so, your Honor.

THE COURT:  Thank you.

I have seen the government's letter.  Counsel for the United States, is there anything that you would like to say about that issue?

MS. RAVENER:  Your Honor, I think it is laid out in our submission, but we are happy to address any questions or concerns on behalf of the Court.

THE COURT:  Thank you.

Counsel for defendants, what is your view regarding this issue and to the proposed modification to the protective order suggested by the government in their April 22nd letter?

MS. NECELES:  Your Honor, we have had extensive conversations about this already with the government.  In fact, we withdrew the witness list at their request.  They called us after we filed it.  We believe we were perfectly permitted to do that under the order.  We looked at the order beforehand. They directed our attention to the order.  We had discussions about it afterwards.

A.  We worked out what we believed was a compromise.  When Mr. Bell mentioned earlier that he had provided an updated exhibit list, that was part of the agreement when we withdrew the letter, that they would provide us with an updated exhibit

I4nrgra2

list.  They were supposed to provide us with an updated witness list as well but they did not do that.

We filed this letter to bring it to the Court's attention.  We believe that especially as things go along, they have no intention in general of filing 3500 material or anything like that.  It is difficult enough during a trial to do things quickly.  There are times when we just need to file things, to be able to get things done in a speedy fashion.

It is very difficult to file things under seal, particularly, your Honor, this is stuff that's going to be public in the courtroom.  This is the first time this dispute has arisen in this case.  We have not been out there filing things to get them into the public record or playing games in this way.

So I oppose making it more difficult.  It is difficult enough to move things along quickly.  I don't really understand the need for this.

THE COURT:  Understood.

Mr. Grant, any additional argument on this point?

MS. CAPPELLINO:  No, your Honor.

THE COURT:  I am going to grant the government's request for a modification of the 3500 protective order.  Fundamentally, I appreciate both that the defense is not planning to do this generally going forward.

I also understand the concern about maintaining the

I4nrgra2

ability of the defense to nimbly file motions with the Court. My individual rules I think address this issue. The only additional work that must be done is to provide the proposed materials under seal to permit necessary redactions before public filing.

If the defense wishes to file a motion and bring something to the Court's attention immediately, you can in my view file the motion with the relevant materials redacted and request that they be filed under seal, providing me with the full unredacted version of the records to my chambers email address. That way the material can be submitted to the Court for a decision. The only incremental work involved are the redactions.

I would expect that given this issue, in essence, any substantive information included in the 3500 materials would not be publicly filed in connection with such a motion. I believe that the request embedded in the government's letter is appropriate given the nature of the 3500 materials, which can contain significant information related to the private affairs of witnesses. It could also subject them to harassment or the like.

As a result, I believe that maintaining these records' privacy and confidentiality is appropriate and the suggestion that I impose a process before the documents are publicly filed on the court's docket is a reasonable one. I will enter a

I4nrgra2

separate order modifying that paragraph of the order as requested by the government.

Anything else for us to talk about?

MR. BELL:  No, your Honor.

MS. NECELES:  No, your Honor.

MS. CAPPELLINO:  No, your Honor.

THE COURT:  Thank you all.  This proceeding is adjourned.

(Adjourned)